# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| G.E. STRICKLIN, | : | |
| | : | |
| derivatively on behalf of NEWS CORPORATION, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 11-cv-05073 UA |
| v. | : | |
| | : | **ECF CASE** |
| K. RUPERT MURDOCH, JOSE MARIA | : | |
| AZNAR, NATALIE BANCROFT, PETER L. | : | **VERIFIED COMPLAINT** |
| BARNES, CHASE CAREY, KENNETH E. | : | |
| CROWLEY, DAVID F. DeVOE, VIET DINH, | : | |
| RODERICK I. EDDINGTON, ANDREW | : | |
| S.B. KNIGHT, JAMES R. MURDOCH, | : | |
| LACHLAN K. MURDOCH, THOMAS J. | : | |
| PERKINS, ARTHUR M. SISKIND, JOEL | : | |
| KLEIN, JOHN L. THORNTON, REBEKAH | : | |
| WADE BROOKS, LES HINTON and PAUL V. | : | |
| CARLUCCI, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| NEWS CORPORATION, | : | |
| | : | |
| Nominal Defendant. | : | |

Plaintiff, G.E. Stricklin ("Plaintiff"), by and through her undersigned attorneys, alleges upon personal knowledge as to herself and her own acts, and as to all other matters, upon information and belief based upon, *inter alia*, the investigation conducted by her attorneys, as follows:

## NATURE OF ACTION

1.      This is a shareholders' derivative action brought under and pursuant to Federal Rule of Civil Procedure 23.1 by a shareholder of News Corporation ("News Corp." or the

"Company") on behalf of the Company against its Board of Directors ("Board") and certain members of its senior management (the "Individual Defendants" or, collectively, "Defendants," as defined below) to remedy Defendants' violations of law, including breaches of fiduciary duties, obstruction of justice, waste of corporate assets, and other conduct contrary to the interests of News Corp. and its shareholders, which have caused and is continuing to cause substantial monetary losses to the Company and other damages, such as to its reputation, goodwill, standing in the business community, and loss of business opportunities.

2.     News Corp., one of the world's biggest media conglomerates, has been brought to its knees in recent days as a result of, *inter alia*, an unfolding scandal involving the unscrupulous practices of its senior officers and media outlets, the recently shuttered *News of the World*, a 168-year-old, tabloid-style newspaper based in London, England, the payment of bribes, and other illegal conduct in this country and abroad.  As a direct result of the still-unfolding scandal, the most visible aspect of which has been characterized as "cell phone hacking," which conduct has apparently has been internally known of and condoned for at least five years by Defendant, K. Rupert Murdoch ("Rupert"), and members of his family, among other Defendants, as well as the alleged bribery of public officials in, *inter alia*, the United Kingdom and the United States, News Corp. has now abandoned its $12 billion bid to acquire the remainder of British Sky Broadcasting ("BSkyB"), the Company's stock price has eroded by approximately 15% since the end of May, 2011, the Company and/or its subsidiaries are the subject of criminal investigations and hearings both in the United States and Great Britain, and senior executives are abruptly resigning and/or being arrested by London's Metropolitan Police Service ("Scotland Yard").

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over the claims asserted by Plaintiff herein pursuant to

28 U.S.C. § 1332(a)(1), in that Plaintiff and Defendants are citizens of different States and the

amount in controversy exceeds $75,000, exclusive of interests and costs.  This Court also has

supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over all other claims that are so

related to claims over which this Court may exercise original jurisdiction in that they form part

of the same case or controversy.  This action is not a collusive one designed to confer jurisdiction

on this Court that it would not otherwise have.

4.     This Court has jurisdiction over the Defendants named herein because each is

either a corporation that conducts business in and maintains operations in this District, or is an

individual with sufficient minimum contacts with this District so as to render the exercise of

jurisdiction by this Court over him or her permissible under traditional notions of fair play and

substantial justice.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because: (i) News

Corp. maintains its principal place of business within this District; (ii) one or more of the

Individual Defendants either resides in or maintains offices in this District; (iii) a substantial

portion of the transactions and wrongs complained of herein took place within this District; and

(iv) Defendants have received substantial compensation in this District by doing business here

and engaging in numerous activities that had an effect in this District.

## THE PARTIES

6.     Plaintiff is a current shareholder of News Corp., and has continuously been, as

successor in interest, a representative and/or beneficial owner of the Company's Class A

common stock and Class B common stock at all times relevant herein. Such shares have been owned in her family for more than 15 years. Plaintiff is a citizen of the State of Florida.

7.      Nominal Defendant, News Corp., is a Delaware corporation, reincorporated from a South Australia company in 2004, with its principal offices located at 1211 Avenue of the Americas in New York City, New York. News Corp. describes itself as a diversified global media company, whose media operations include cable network programming; filmed entertainment; television; direct broadcast satellite television; and publishing, which are conducted principally in the United States, Continental Europe, the United Kingdom, Australia, Asia and Latin America. As of March 31, 2011, News Corp. had total assets of approximately $60 billion and total annual revenues of approximately $33 billion. The Company's Class A common stock is publicly traded in NASDAQ under the symbol "NWSA" and its Class B common stock is publicly traded in NASDAQ under the symbol "NWS." No claims for damages are made herein against the Company. News Corp. was created in 1979 as the holding company for News Ltd., which Rupert organized in the early 1950s and which owned several newspapers in his native Australia. In 1976, after acquiring several United States newspapers, News Ltd. purchased the *New York Post*. In 1985, the Company purchased the Metromedia group of television stations (which necessitated Rupert's becoming a U.S. citizen), which became the fourth commercial broadcasting television network, the Fox Broadcasting Company. Another of the Company's subsidiaries, News International Ltd. (formerly News International plc) ("News International"), publishes several British newspapers, including the tabloid newspapers, *The Sun* and its Sunday-only version, the *News of the World*. *News of the World*, established in 1843, until it discontinued operations on July 10, 2011, was reportedly the largest

selling English language newspaper in the world. According to media reports on its demise, the *News of the World* had special meaning for Rupert, as its purchase in 1969 formed the foundation of News Corp.'s extensive British media holdings.

8.      Rupert is the Company's Chief Executive Officer ("CEO") and Chairman of the Company's Board, positions he has held since 1979 and 1991, respectively. Rupert has also served as a Director of the following companies: BSkyB (from 1990 to 2007); Gemstar-TV Guide International Inc. (from 2001 to 2008); The DIRECTV Group, Inc. (from 2003 to 2008); and China Netcom Group Corporation (Hong Kong) Limited (from 2001 to 2005). As described in the Company's Definitive Proxy Statement, filed with the Securities and Exchange Commission ("SEC") on Schedule 14A on August 31, 2010 (the "2010 Proxy"), Rupert "has been the driving force behind the evolution of the Company from the single, family-owned Australian newspaper he took over in 1953 to the global public media company it is today" and he "brings to the Board invaluable knowledge and expertise regarding the Company's history and provides strong operational leadership and broad strategic vision for the Company's future." Rupert received over $30 million in compensation from News Corp. for fiscal year 2008 and he received $22 million for fiscal years 2009 and 2010, respectively. According to the July 18, 2011 *Financial Times* report, which refers to News International as "Rupert Murdoch's UK newspaper group," the Company's "culture is so closely identified with Rupert Murdoch and his family." Indeed, media accounts typically do not distinguish between News Corp. and "Murdoch," they being so interwoven publicly.

9.      Defendant, James Murdoch ("James"), is the younger of Rupert's two sons. He was recently appointed Deputy Chief Operating Officer of the Company, the #3 position in its

executive ranks. He has been a Director and the Chairman and Chief Executive, Europe and

Asia, of the Company since 2007, and previously served an Executive Vice President of the

Company, and served as a member of the Board from 2000 to 2003. James was the CEO of

BSkyB from 2003 to 2007, and he has served as a Director of BSkyB since 2003 and as its Non-

Executive Chairman since 2007. He also has served as a Director of NDS Group Limited

("NDS") since 2009. James was formerly the Chairman and CEO of STAR Group Limited, a

subsidiary of the Company, from 2000 to 2003. He has served as a Director of GlaxoSmithKline

plc since 2009 and as a Director of Sotheby's since May, 2010. According to the 2010 Proxy,

James "is a key member of the Company's management team, with responsibility for the

Company's European and Asian operations [, having] served in a number of leadership positions

within the Company and at its affiliates over the past 14 years [and] [h]is broad-based

experience, extensive knowledge and strategic perspective of the Company's business and

operations enable him to be a valuable resource for the Board." James was instrumental in

paying "hush money" to victims (through "settlements") of the telephone hacking described

herein. Referring to his approval of such "settlements," James now says: "I now know that I did

not have a complete picture when I did so. This was wrong and a matter of serious regret."

James has been described in the January 29, 2011 issue of the *Financial Times* as "brash and hot-

tempered" and "clever and ruthless, eager to battle the media establishment, and willing to take

big risks," such as trying to cover up the widespread phone hacking described herein. James

received over $17 million in compensation from News Corp. for fiscal year 2008 and he received

over $10 million for fiscal years 2009 and 2010, respectively.

      10.     Defendant, Jose Maria Aznar ("Aznar"), is a member of the Company's Board,

and has been since 2006. Aznar is the Honorific President of the Partido Popular of Spain and served as its Executive President from 1990 to 2004. He was the President of Spain from 1996 to 2004, and was a member of The State Council of Spain from 2005 to 2006. Since 2004, Aznar has been has been a Distinguished Scholar at the Edmund A. Walsh School of Georgetown University. For the fiscal year ending on June 30, 2010, Aznar earned $220,000 for his role with the Company.

11.     Defendant, Natalie Bancroft ("Bancroft"), has been a Director of the Company since 2007. In connection with the Company's 2007 $5.6 billion acquisition of Dow Jones & Company, Inc. ("Dow Jones"), which was controlled by the Bancroft family and owned Dow Jones & Company, which published the prestigious business newspaper, *The Wall Street Journal* ("*WSJ*"), an agreement was reached whereby the Company agreed to elect a member of the Bancroft family or another mutually agreed upon individual to the News Corp. Board. Bancroft is a professionally trained opera singer, has studied journalism and is a graduate of the L'Institut de Ribaupierre in Lausanne, Switzerland. For the fiscal year ending on June 30, 2010, Bancroft earned $220,000 for her role with the Company.

12.     Defendant, Peter L. Barnes ("Barnes"), has been a Director of the Company since 2004 and is a member of the Audit Committee. He has been a Director of Ansell Limited since 2001 and its Chairman since 2005. Barnes served in various senior management positions in the United States, the United Kingdom and Asia at Philip Morris International Inc. from 1971 to 1998, including as President of Philip Morris Asia Inc. Per the 2010 Proxy, he "brings to the Board the leadership, operational and financial skills gained in his several roles at Philip Morris, as well as through his service as a Director at a number of private and public companies,

including his service as Chairman of several of these companies." For the fiscal year ending on June 30, 2010, Barnes earned $236,000 for his role with the Company.

13.    Defendant, Chase Carey ("Carey"), has been the President and Chief Operating Officer of News Corp., and Deputy Chairman of the Board, since July 2009, having previously served the Company in numerous roles beginning in 1988, including as Co-Chief Operating Officer from 1996 to 2002, as a consultant from 2002 to 2003 and as a Director from 1996 to 2007. Carey has served as the Chairman of the Supervisory Board of Sky Deutschland AG, a German pay-television operator and affiliate of the Company, since July 2010. At all relevant times, he has been a close confidante of Rupert and has acted as his surrogate in many of Rupert's business dealings. He served as a President and CEO of DIRECTV from 2003 to 2009 and as one of its Directors from 2003 to June 2010. Carey also served as a Director of BSkyB from 2003 to 2008, as a Director of Gateway, Inc. from 1996 to 2006 and as a Director of Yell Finance B.V. from 2004 to 2007. According to the 2010 Proxy, "[a]s the Company's President, Chief Operating Officer and Deputy Chairman, Mr. Carey is a key member of the Company's management team ...[,] has a broad and deep understanding of the Company and its operations, having served in a variety of leadership positions within the Company and with its affiliates for over 21 years [and] brings valuable executive leadership experience to the Board, as well as unparalleled expertise in the media and satellite television industries." For the fiscal year ending on June 30, 2010, Carey received over $26 million in compensation from News Corp.

14.    Defendant, Kenneth E. Cowley ("Cowley"), has been a Director of the Company since 1979 and serves as a member of the Nominating and Corporate Governance Committee. Cowley has been the executive Chairman of RM Williams Holdings Pty Limited, an Australian

apparel company, since 1994, and served as a senior executive of News Limited, a subsidiary of the Company, from 1964 to 1997, including as its Chairman and Chief Executive from 1980 to 1997. For the fiscal year ending on June 30, 2010, Cowley earned $231,000 for his role with the Company.

15.     Defendant, David F. DeVoe ("DeVoe"), has been a Director of News Corp. and its Chief Financial Officer ("CFO") since 1990, and has served as the Company's Senior Executive Vice President since 1996. DeVoe has been a Director of BSkyB since 1994 and a Director of NDS Group Limited since 1996. He also served as a Director of Gemstar-TV Guide from 2001 to 2008 and as a Director of DIRECTV from 2003 to 2008. DeVoe received compensation from News Corp. of approximately $10 million, $9 million, and $7 million, respectively, for fiscal years 2008, 2009, and 2010.

16.     Defendant, Viet Dinh ("Dinh"), a lawyer, has been a Director of the Company since 2004 and serves as Chairman of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Dinh has been a Professor of Law at Georgetown University Law Center since 1996. He was an Assistant Attorney General for Legal Policy in the U.S. Department of Justice from 2001 to 2003. Dinh has been the founder and a Principal of Bancroft Associates PLLC since 2003 and of Bancroft Capital Management since 2006. He has served as a Director of M&F Worldwide Corp. ("M&F"), controlled by Ronald O. Perelman, since 2007. According to the 2010 Proxy, Dinh "offers the Company his experience, intellect and acute knowledge of and contacts within the U.S. government [and because] [h]e teaches on issues of corporate governance [, he] brings to the Board and the committees on which he serves corporate governance expertise, which is also strengthened by his service on the

boards of other public companies." In fact, Dinh was and is intimately involved in the operations of Strayer Education, Inc. ("Strayer"), presently under investigation by the SEC and the Federal Trade Commission and in private litigation in connection with, *inter alia,* allegations of securities fraud, fraudulent marketing of Strayer to potential students, and otherwise. Dinh, by reason of his positions with Strayer, has actively participated in covering up the wrongdoing of Strayer and its senior officers. Dinh is also a colleague of Ronald Perelman and, in serving on the Board of M&F, has facilitated Perelman's decades-long predatory business strategies in derogation of shareholder rights. Notwithstanding his personal complicity in and knowledge of at least some of the wrongful conduct alleged in this Complaint and predisposition against high standards of corporate governance as exemplified by his roles at Strayer and M&F, in furtherance of the Board's efforts to "whitewash" the other Defendants named herein as well as colleagues of the Murdochs implicated in such conduct, his fellow Directors, at the behest of Rupert, appointed Dinh as one of two purportedly independent members of a "special committee" of the Board charged with investigating the phone hacking described herein. Dinh is not independent, disinterested or otherwise competent to conduct such an investigation fairly and in the best interests of the Company and its public shareholders. For the fiscal year ending on June 30, 2010, Dinh earned $258,000 for his role with the Company.

17.     Defendant, Roderick I. Eddington ('Eddington"), has been a Director of the Company since 1999 and serves as the Chairman of the Audit Committee and as a member of the Compensation Committee. Eddington has served as Non-Executive Chairman, Australia and New Zealand of J.P. Morgan since 2006. From 2000 to 2005, he served as a Director and the Chief Executive of British Airways plc and, from 1992 to 1996, he was the Managing Director of

Cathay Pacific Airways. Eddington has been a Director of John Swire & Sons Pty Ltd. since 1997, a Director of Rio Tinto plc since 2005 and a Director of CLP Holdings Limited since 2006. He also served as a Director of Allco Finance Group Limited from 2006 to 2009. For the fiscal year ending on June 30, 2010, Eddington earned $274,000 for his role with the Company.

18.     Defendant, Andrew S.B. Knight ("Knight"), has been a Director of the Company since 1991 and serves as Chairman of the Compensation Committee and as a member of the Audit Committee. Knight was the Chairman of News International, a subsidiary of the Company, from 1990 to 1995, and he also served as the CEO of Daily Telegraph plc from 1986 to 1989 and as an Editor of *The Economist* magazine from 1974 to 1986. Knight has been the Chairman of J. Rothschild Capital Management Limited since 2008. He also served as a Director of Templeton Emerging Markets Investments Trust from 2003 to 2008 and as a Director of Rothschild Investment Trust Capital Partners plc from 1997 to 2008. Knight was also a Director of The Reader's Digest Association, Inc. from 2007 to 2009. For the fiscal year ending on June 30, 2010, Knight earned $281,960 for his role with the Company.

19.     Defendant, Lachlan K. Murdoch ("Lachlan"), is the older of Rupert's two sons. He has been a Director of the Company since 1996, has served as an advisor to the Company from 2005 to 2007, and served as its Deputy Chief Operating Officer from 2000 to 2005. Lachlan was a Director of NDS Group Limited from 2002 to 2005. Since 2005, when he resigned abruptly due to, *inter alia*, disagreements with Rupert, he has served as the Executive Chairman of Illyria Pty Ltd, a private investment company. The 2010 Proxy states that Lachlan "has extensive experience serving in several senior leadership positions within the Company, in particular as head of News Limited, the *New York Post* and as the Deputy Chief Operating

Officer of the Company." Lachlan received almost $2 million for his role with the Company for the fiscal year ending on June 30, 2010.

20.     Defendant, Thomas J. Perkins ("Perkins"), has been a Director of the Company since 1996 and serves as a member of the Audit, Compensation, and Nominating and Corporate Governance Committees. He has been a partner of Kleiner Perkins Caufield & Byers, a venture capital company, since 1972. From 2004 to 2006, Perkins was a Director of Hewlett-Packard Company ("H-P") during a period when H-P management was paying substantial bribes in violation of the Foreign Corrupt Practices Act ("FCPA"), a practice known or which should have been known to each of its Board members. Perkins has, at relevant times, been a beneficiary of his connections with the Murdochs and introductions provided by them. For the fiscal year ending on June 30, 2010, Perkins earned $258,000 for his role with the Company.

21.     Defendant, Arthur M. Siskind ("Siskind"), has been a Director of News Corp. since 1991 and the Senior Advisor to the Chairman since 2005. From 1991 to 2005, he was the Company's Group General Counsel, the Senior Executive Vice President from 1996 to 2005, and the Executive Vice President from 1991 to 1996. Siskind has been a Director of BSkyB since 1991 and a Director of NDS Group Limited from 1996 to 2009. He also was an Adjunct Professor of Law at the Cornell Law School from 2007 to 2009 and was an Adjunct Professor of Law at Georgetown University Law Center from 2005 to 2007. For the fiscal year ending on June 30, 2005, Siskind earned almost $4 million for his role with the Company.

22.     Defendant, John L. Thornton ("Thornton"), has been a Director of the Company since 2004 and serves as a member of the Compensation, Nominating, and Corporate Governance Committees. Thornton has been a Professor and Director of Global Leadership at

Tsinghua University School of Economics and Management in Beijing since 2003 and a Director

and Non-Executive Chairman of HSBC North America Holdings Inc. since 2008. He was also

President and Co-Chief Operating Officer of The Goldman Sachs Group, Inc. from 1999 until

2003 and a Senior Advisor to Goldman Sachs from 2003 to 2004. In addition, Thornton has

been a Director of the Ford Motor Company since 1996, a Director of China Unicom (Hong

Kong) Limited since 2008, and a Director of HSBC Group Holdings since 2008. He was also a

Director of The Industrial and Commercial Bank of China Ltd. from 2005 to 2008, a Director of

China Netcom Group Corporation (Hong Kong) Ltd. from 2004 to 2008, and a Director of Intel

Corporation from 2003 to May 2010. For the fiscal year ending on June 30, 2010, Thornton

earned $242,000 for his role with the Company.

23.     Defendant, Joel Klein ("Klein"), a lawyer, has been a Director of News Corp.

since 2010 and the Senior Advisor to the Chairman, principally advising Rupert as to how best to

contain the hacking scandal as it was unfolding and to direct evasive legal and other strategies in

that regard. Although a relative newcomer to the Company's Board and not personally

implicated in the hacking scandal, Klein has been intimately involved in the cover-up of the

wrongdoing alleged herein and developing strategies to protect the Murdochs and their

confederates from liability, personal embarrassment and otherwise being held accountable for the

wrongdoing alleged herein. Indeed, at the time he was being recruited to join News Corp., Klein

was briefed about, *inter alia*, the facts and circumstances surrounding the Company's potential

exposure due to the hacking scandal and other wrongful conduct of the Defendants, none of

which briefing and communications related to it were confidential, attorney-client

communications since Klein was not acting as a lawyer for News Corp. at the time. Klein knew

or should have known at the time he was being recruited that he was expected to (and would) owe personal allegiance to Rupert, who promised him millions of dollars of compensation for his services and a substantial increase over his former position as head of New York City's school system. Indeed, Klein is expected to receive a yearly salary of $2 million, and an annual bonus of at least $1.5 million, in addition to a $1 million signing bonus. Notwithstanding his personal knowledge of at least some of the wrongdoing alleged herein before becoming a member of the Company's Board and his role in devising strategies to protect the Murdochs and their confederates since joining the Board, particularly after Scotland Yard re-opened its investigation of the phone hacking on January 27, 2011, his fellow directors, at the behest of Rupert, appointed Klein as one of two purportedly independent members of a "special committee" of the Board charged with investigating the phone hacking described herein. Klein is not independent, disinterested or otherwise competent to conduct such an investigation fairly and in the best interests of the Company and its public shareholders. As reported in *The Wall Street Journal* of July 19, 2011, Klein, who was labeled as a "fixer" in the article, is now one of the inner circle of advisors to whom Rupert has turned. Indeed, Klein sat immediately behind Rupert and James as they testified before Parliament. It was further reported by *The Wall Street Journal* that Rupert had "formalized Mr. Klein's role at the center of the response to the crisis, announcing that he had selected [him] to 'provide oversight and guidance' and that Mr. Klein along with…Dinh, would keep the Board apprised." Indeed, Klein and Dinh had set up a purportedly independent management and standards committee referred to above to investigate the admitted phone hacking that the Company still calls "allegations." The supposedly independent committee, to be nominally headed by a commercial lawyer, will report to Klein who, in return, will report to

-14-

Dinh, the two principal architects of management's present legal defense strategies.

24.     Defendant, Rebekah Wade Brooks ("Brooks"), was the former CEO of News International, who resigned her position just prior to being arrested by Scotland Yard on July 17, 2011 in connection with the hacking and bribery conduct described herein.[1] She has engaged personally in illicit and/or illegal information-gathering involving, *inter alia*, breaking and entering and installing voice recording equipment to obtain stories. According to *The Wall Street Journal* of July 18, 2011, "Such tactics earned her a rapid rise through the ranks and became the *News of the World's* editor in 2000 and, later, … of the *Sun*." During this period, her relationship with Rupert was solidified and, even after her arrest in 2005 on suspicion of assaulting her husband, she was promoted by Rupert to head News International.

25.     Defendant, Les Hinton ("Hinton"), is a long-time associate and confidante of Rupert, having worked for him for more than 52 years, most recently as CEO of Dow Jones & Co., the parent of, *inter alia*, *The Wall Street Journal*. At relevant times, Hinton was CEO of News International, Inc. According to *The Wall Street Journal* of July 16, 2011, "The company is eager [to] wall off the properties Mr. Hinton has lately overseen—including *The Wall Street Journal* and *Dow Jones Newswires*—from the messy British tabloid scandal." Hinton resigned voluntarily in the wake of the unfolding hacking scandal.

26.     Defendant, Paul V. Carlucci ("Carlucci"), is the Chairman and CEO of News America, a News Corp. subsidiary, as well as Publisher of the *New York Post*.

---

[1] Brooks' substitute at News International is to be Tom Mockridge, Chief Executive of Sky Italia since 2003. Mockridge, apparently at the behest of Rupert, caused Sky Italia to refuse to carry broadcasting by a cable network, Current TV, because it had hired liberal political news commentator, Keith Olbermann, who had a long history of being highly critical of Rupert.

-15-

27.     Unless otherwise noted, Rupert, James, Carey, DeVoe, Brooks, Hinton, Carlucci and Siskind are referred to herein collectively as "Officer Defendants," and Aznar, Bancroft, Barnes, Cowley, Dinh, Eddington, Knight, Lachlan, Perkins, Klein and Thornton are referred to herein collectively as "Director Defendants." The Officer Defendants and Director Defendants are collectively referred to as "Individual Defendants," and with News Corp., as "Defendants." All of the Defendants are citizens of states other than Florida.

## FACTUAL ALLEGATIONS

### A.     Fiduciary Duties of the Individual Defendants

28.     By reason of their positions as officers, directors, and/or fiduciaries of News Corp. and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed News Corp. and its shareholders fiduciary obligations of loyalty, good faith, and candor, and were and are required to use their utmost ability to control and manage News Corp. and its subsidiaries in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

29.     Each of the Directors and Officers of the Company owes to News Corp. and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to News Corp.'s operations, performance, and management, among other things, so

-16-

that the market price of the Company's common stock would be based on truthful and accurate information.

30.    Each of the Individual Defendants was an agent of each of the other Individual Defendants and of News Corp., and was at all times alleged herein acting within the course and scope of such agency.

31.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of News Corp. and/or its subsidiaries, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with News Corp., each of the Individual Defendants had knowledge of material, non-public information regarding the Company.

32.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of News Corp. By virtue of such duties, the Individual Defendants were required to, among other things:

    a.    Ensure that the Company fully complied with its legal obligations and requirements, including acting only within the scope of its legal authority, disseminating truthful and accurate statements to the SEC and the investing public, and abiding by laws governing news-gathering, payment of bribes and otherwise;

    b.    Conduct the affairs of the Company in an efficient, legal, ethical and business-like manner so as to make it possible to provide the highest quality performance of their business, to avoid wasting the Company's assets, and to maximize the value of News Corp. and

its common stock;

   c.  Remain informed as to how News Corp. and its subsidiaries conducted their operations and, upon receipt of notice or information of imprudent, unsound or questionable conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices, to make such disclosures as necessary to comply with applicable laws and to terminate employees who have caused damage to the Company and/or its subsidiaries; and

   d.  Exercise good faith to ensure that News Corp. and its subsidiaries are, and at all times were, operated in a diligent, honest, and prudent manner, and complied with all applicable laws, rules, regulations and requirements.

   33. Moreover, News Corp.'s own Standards of Business Conduct has expressly provided:

> **Ensuring Integrity and Transparency of Conduct**
>
>      ***
>
> •  We refrain at all times from self-dealing, such as steering company business to where we or our family members will benefit improperly.
>
>      ***
>
> **Refraining From Improper Benefit**
>
> Keep in mind that you must not only refrain from improperly benefiting from your position or access, you must also guard against family or household members receiving improper advantages. News Corporation employees are responsible for making sure that those close to them do not inappropriately benefit from the employee's position or access.
>
>      ***

**Safeguarding Company Reputation and Property**

***

> Avoiding Risk to Reputation: The Company's reputation is one of
> our most valuable assets. Therefore, we are always careful to be
> sure that we don't do anything that would harm that reputation, or
> that would otherwise bring the Company into disrepute.

34.     The Individual Defendants, as detailed herein, breached their fiduciary duties,

including the duties of loyalty, good faith, and candor, while also violating the Company's

internal standards of conduct.  In addition, as a result of the Individual Defendants' wrongful

actions and course of conduct, the Company is now the subject of numerous governmental

inquiries and investigations, and has expended, and will continue to expend, significant sums of

money investigating and defending against these investigations.

35.     In connection with the breaches of duty referred to herein, some or all of the

Individual Defendants, together with lawyers retained by them or by News Corp. and/or its

subsidiaries, have used such lawyers (including those within the Company and/or on its Board)

to shield their obstruction of justice and illicit conduct from inquiry by creating a pretext of

confidential attorney-client privilege to cover their communications.

**B.      Phone Hacking Scandal And Other Illicit Information-Gathering Practices**

36.     In January 2003, Andy Coulson ("Coulson") took over as editor of the *News of*

*the World* following the move of the editor, Brooks, to another News International newspaper,

*The Sun*.  Brooks, reportedly held in high regard by Rupert, had been *News of the World* editor

since May 2000.  Later in 2003, both Brooks and Coulson testified before a British parliamentary

committee, during which Brooks admitted to paying police for information, in violation of the

FCPA and applicable British law. Brooks stated to Parliament: "We have paid the police for information in the past." Neither the Company's Board or anyone else at the Company reprimanded her or took any action against her despite the fact that such practices were violations of the FCPA and may have been illegal under then-British law as well. Additionally, it appears that the Company may have indirectly paid bribes to Paul Stephenson, the now-resigned head of Scotland Yard, through Neil Wallis who, *inter alia*, caused him to be provided with substantial benefits, possibly paid for indirectly by the Company.

37.     Hinton similarly disavows any knowledge of wrongdoing beyond the activities of Clive Goodman, despite knowing that *News of the World* had numerous documents and e-mails within his and Brooks' control showing that there were as many as 4,000 instances of phone hacking.[2]

38.     In August, 2006, the Royal Editor at the *News of the World*, and two others, including the editor of the *Weekly News*, were arrested over allegations of phone hacking made by the British Royal Family in 2005. Coulson resigned as a result, although insisting that he had no knowledge of any illegal activities. Coulson went on to become spokesperson for British Prime Minister David Cameron. In March, 2006, according to several reports, a senior aide to Rupert told a British parliamentary committee that a "rigorous internal investigation" found no evidence of widespread hacking at the *News of the World*, notwithstanding the fact that apparently he, Brooks, Rupert, James, and other members of the Board were well aware that it

---

[2] Hinton's claim that he was not aware of the existence and extent of the wrongdoing is belied by his close supervision of Brooks and daily strategy sessions with her, as well as his hiring of Neil Wallis as Deputy Editor of *News of the World*, notwithstanding his former employer having been previously embarrassed by his journalistic activities and having paid out over $400,000 to settle claims against him.

had taken place.  Coulson was arrested on July 8, 2011 by Scotland Yard.

39.    In 2009 and 2010, further revelations emerged regarding the extent of the phone

hacking and the number of *News of the World* employees who may have been aware of the

practices.  In July 2009, *The Guardian*, a rival British newspaper, made a series of allegations of

more widespread phone hacking activities at the *News of the World*, aimed at other individuals

and celebrities.[3]  By March 2010, the paper had reportedly spent over £2 million in "hush

money" paid to victims of phone hacking and/or members of their families.  According to a July

8, 2011 article in *The Financial Times*, James personally participated in at least some of these

settlements, although he claimed not to have knowledge of the full extent of the wrongful

activity.  On September 1, 2010, *The New York Times* published the results of an investigation

begun almost six months before, which provided additional details regarding the extent of phone

hacking at the *News of the World* and about Coulson's alleged knowledge of it.  *The Times'*

investigation had revealed that a *News of the World* journalist had been attempting to hack into

the telephone messages of a "television personality" in 2010, resulting in the journalist's

suspension and legal action by the personality.  These revelations resulted in hearings by the

British Parliament, as well as a renewed investigation by Scotland Yard.  Previously, due to the

interconnected personal/political relationships between and among the Murdochs, Coulson,

Brooks, and representatives of Scotland Yard, including Paul Stephenson, Police Commissioner

(who met with News Corp. executives and editors 18 times between November 2005 and

November 2010), John Yates, Assistant Police Commissioner (who has social ties to News

---

[3]  In these instances, the wrongful conduct involved the unauthorized access of voicemail
systems, rather than illegal access to actual phone lines or live telephone conversations.

International staff), Andy Hayman (lead investigator in the hacking case and now a columnist for *The Times of London*) and Neil Wallis (media consultant to Scotland Yard, former editor of *News of the World*, and News International's "mole" within Scotland Yard), substantial amounts of evidence regarding the hacking charges remained unreviewed and, except for a single reporter, Clive Goodman, the investigation was "deep sixed."

40. The extent of the phone hacking and similar illicit information-gathering techniques by News International media, which appear to have been directed at, *inter alia*, former British Prime Minister Gordon Brown and members of his family, staff at Scotland Yard, and many prominent and/or newsworthy individuals, has continued to unfold, almost on a daily basis.[4]  Brooks resigned on July 15, 2011, maintaining that she was unaware of any improper activity during her time at the *News of the World* or thereafter.  She has since been arrested by Scotland Yard. Also on July 15, 2011, Hinton, the top executive at the Company's Dow Jones & Co. subsidiary, who had formerly been Brooks' supervisor, likewise resigned. At all relevant times, Brooks and Hinton were and are extremely close confidantes of Rupert.

41. As her arrest indicates, Brooks' claimed lack of knowledge of the hacking and its cover-up is being disputed. According to a *Reuters* Special Report, published on July 16, 2011, entitled "Inside Rebekah Brooks' *News of the World*," the news room was "an industrialized operation of dubious information-gathering, reporters under intense pressure attempting to land exclusive stories by whatever means necessary, and a culture of fear, cynicism, gallows humor

---

[4] It has been widely reported that the Federal Bureau of Investigation ("FBI") has begun an investigation of News Corp.'s illicit information-gathering techniques within the United States involving, *inter alia*, alleged pay-offs to members of the New York City Police Department. Members of the United States Congress, following the lead of the British Parliament, are also seeking to commence legislative investigations of the conduct of the Company, the Defendants,

and fierce internal competition." The *Reuters* Special Report explained:

> Four former employees of [*The Sun*] have told Reuters that Brooks' denials are
> simply not credible. They say people on the papers' newsdesk, the hub that
> directs news coverage, were regularly grilled about the top stories by Brooks and
> later by her successor Andy Coulson, who resigned over the phone-hacking
> scandal in 2007 and went on to become Prime Minister David Cameron's
> spokesman. "They went in and they were cross-examined for two hours every
> day. And it was all about the genesis of all the stories," the first ex-reporter, who
> worked at the paper for seven years, told Reuters.
>
> The *News of the World*'s reporting methods were first questioned when it
> published a story about an injury to Prince William's knee in 2005, prompting
> fears his aides' voicemail messages were being intercepted. The royal family
> complained to police. More than a year later the paper's royal editor Clive
> Goodman and private detective Glenn Mulcaire were jailed for six months ....

42.     The Company's management, directly and indirectly, improperly used News

Corp.'s assets to pay hush money in the form of severance compensation, reimbursement of legal

expenses and otherwise to protect the Murdochs and to influence future testimony. By way of

example, notwithstanding her complicity in the wrongdoing alleged herein, the Murdochs caused

the Company to agree to pay approximately $5.6 million to Brooks as a severance payment,

despite the fact that she voluntarily tendered her resignation. Similarly, the Murdochs caused the

Company to pay or agree to pay Hinton a far greater amount despite the fact that he too resigned

voluntarily from his positions at the Company.

43.     The agreement to pay Brooks was made despite Rupert's decision to accept

Brooks' resignation, even after he had expressed "total" confidence in her only a week earlier.

Indeed, when he arrived in London about 10 days ago, Rupert said that protecting her was his

chief concern. According to *The New York Times* of July 18, 2011, when Rupert was asked last

week to identify his chief priority in the affair, he pointed to Brooks and said, "This one."

---

and News Corp. employees.

According to one member of Parliament, "The water is now lapping around the ankles of the Murdoch family."

44.    In connection with the hacking scandal, the Murdochs caused the closing of *News of the World*, not to benefit the Company but, rather, in the hope that it would benefit James and Brooks, to protect their careers, and that such a closing would cause the scandal to wane from public, police and parliamentary interest.  Not only was the Murdochs' strategy to close *News of the World* ill-considered and not carefully analyzed by the Company's Board, it was unnecessary and a massive waste of News Corp.'s assets.

45.    Notwithstanding its materiality to the Company's business and its reputation in journalism, and the unrelenting public outrage over his and his subordinates' conduct, Rupert testified before Parliament as being out of touch and not knowledgeable with regard to the hacking scandal.  In his testimony, he also would not accept personal responsibility for the "anything goes" culture at News Corp.'s tabloid newspapers.  He blamed what had occurred on "people [he] trusted who let [him] down" and said "it is for them to pay."  There is no reason to believe that Rupert or any of the Individual Defendants will seek repayment to the Company for the damages caused to it as described herein.  Indeed, according to an *Associated Press* report on July 16, 2011, Rupert said the Company had handled the [hacking] crisis "extremely well in every way possible" and complained that he was "getting annoyed" at all the negative headlines.

C.    **Illegal Activities Within the United States**

46.    In the United States, another subsidiary of the Company, News America, has paid out many hundreds of millions of dollars to settle claims that it, under the control of Defendant

Carlucci, used hacking and breaking and entering into the premises of at least one competitor,
Floorgraphics.

47.     According to Floorgraphic's Complaint filed in the federal court for the District of
New Jersey, News America "illegally accessed plaintiff's computer system and obtained
proprietary information" and, thereafter, "disseminated false, misleading and malicious
information about the plaintiff." According to *The New York Times*, in the midst of trial, News
America agreed to pay Floorgraphics $29.5 million and, days later, purchased it for an
undisclosed additional amount.

48.     Other anti-competitive behavior by News America management resulted in its
payments of $500 million to Vallassis Communications and $125 million in 2011 to Insignia
Systems, Inc. Defendant Carlucci was rewarded for such conduct with his appointment as
Publisher of the *New York Post* in addition to retaining his positions with News America. At no
time was he criticized or held accountable by the Board for his and his subordinates' conduct,
which he personally encouraged.

49.     Concurrently with the hacking and bribery activities referred to above, the Board
and senior management of the Company, instead of terminating the employment of Carlucci and
those of his subordinates who have damaged News America and the Company, rewarded him
with the largely honorific position of Publisher of the *New York Post*, leaving him free to
conduct "business as usual" at News America. The Board and senior management looked the
other way while Carlucci paid out almost $700 million to competitors to resolve claims of illegal
and other improper conduct at News America and disregarded the potential that there remain
other, even larger claims, remaining.

-25-

50.    At all relevant times, during the time period when the hacking and other
questionable practices were taking place, each of the Defendants in office knew, or should have
known, that these practices were underway.  Indeed, it appears that Coulson, Brooks, Hinton and
others, possibly including Rupert, decided that Clive Goodman would be an appropriate
scapegoat and a means to deflect investigations away from his higher-ups, including each of
them.  Thereafter, it was contended that the phone hacking was confined to Goodman and had
ended with his departure and subsequent imprisonment.  According to the *Reuters* account:

> Former employees say that's hard to believe, not only because of the story
> approval process, but also because budgets were so tightly controlled that
> payments for such services [*e.g.*, phone hacking] would not have gone unnoticed.
> "It's simply not conceivable that somebody who was editor wouldn't have
> known," says the journalist who spent seven years at the paper, covering general
> news.

> * * *

> When Brooks became editor, at age 31, she had a brief to broaden the paper's
> appeal by intensifying the focus on celebrity and show business news and
> publishing fewer of the harder stories the paper had been known for – politicians
> caught taking illegal drugs or footballers caught with their pants down. ...

> At the same time, the pressure to get exclusive stories was so intense that dubious
> practices were barely questioned.  "They were 'dodgy business HQ.'  I'm not sure
> if people even realized it was illegal.  It was a don't-get-caught culture," said the
> reporter of seven years' standing.  New staff would be given the cold shoulder
> until they'd proved themselves to be "thoroughly disreputable" so their colleagues
> could trust them.  "It was no place for anyone to pipe up and say: 'This doesn't
> seem ethical to me.'  That would have made you a laughing stock."
> Journalists didn't explicitly ask for private investigators to get involved in their
> work, but help would be provided if a reporter got stuck on a promising story.
> "How it arrived on your desk was a bit of a mystery.  You didn't know and you
> didn't ask," said the reporter.  "Every week, somebody's mobile phone records,
> somebody's landline records, sometimes even somebody's medical records.  It
> was common enough not to be notable."

> A fifth former News International employee who worked with *News Of the World*
> journalists at this time said its reporters were under "unbelievable, phenomenal

pressure," treated harshly by bosses who would shout abuse in their faces and keep a running total of their bylines. Journalists were driven by a terror of failing. If they didn't regularly get stories, they feared, they would be fired. That meant they competed ruthlessly with each other.

Because the *News of the World* was a Sunday paper, where a hot story on Tuesday could be useless five days later, pressure was much more intense than at *The Sun*, said the ex-journalist who worked at both titles.

"The *News of the World* was much more secretive than *The Sun*. At *The Sun*, you knew what was going on, what people were working on. In the *News of the World* you never knew what anyone was working on. They'd send you out to a job and wouldn't tell you what it was for. It'd be: 'You're going to meet a man. Don't ask his name and whatever you do don't get him excited. Just take his statement and leave,'" he said. "You became a complete survivalist."

Reporters say they lived in constant fear of byline counts which weeded out those who had filed the fewest stories. "They were always seeking to get rid of people because it was a burn-out job. Their ideal situation was you work your nuts off for six months and they let you work there another six months," said the general news reporter. "Every minute you spent there you felt that your employer hated you."

\* \* \*

Contrary to a popular perception that the tabloid threw large sums of money around to get stories, the news budget was extremely tightly controlled, the journalists said. ... This is another reason it was hard to believe senior editors were not aware of phone hacking and other expensive illegal services provided by outsiders, the ex-reporters told Reuters. [A] private investigator later jailed for phone hacking, was paid more than 100,000 pounds a year by the *News of the World*. "No newspaper editor would not know what a 102,000 pound budget was used for. They knew about every 50 quid," said the long-term freelancer.

Eavesdropping on voicemail or obtaining call logs was initially a money-saving measure, according to the former employees. Rather than committing a reporter to stake out a venue for as long as it took to catch out a couple having an affair, for example, voicemails could first be scrutinized to establish the time and place of a rendez-vous, saving the reporter time and the paper money. As its uses became apparent, it was employed more and more. The general news reporter said he was first shown how to listen in to people's cellphone voicemail by a colleague in the 1990s. "It became the course of first resort rather than last," the long-term freelancer told Reuters.

* * *

Editors would then often use damaging stories as bargaining chips, trading them for future access to public figures or to build relationships with stars. Often, the paper would drop the story they had altogether and publish something more sympathetic. "It would be things like: 'We know you were sleeping with your secretary but we'll keep it out of the paper if you give us the story about how you were given away as a child," said the long-term freelancer.

"They used to call stories 'levers'," said the general news reporter. "They weren't necessarily interested any more in using the story you'd proved or got past the lawyers. They were interested in using the story as leverage in order to get a different story. Sometimes the kind of story that you would bargain as an alternative wasn't actually the truth. It annoyed a lot of reporters. "It was relationship-building for them. Basically, she (Brooks) was trading in your hard work to be friends with influential PRs. They used the stories to bank credit with influential people. It then made the whole raison d'etre of the place something different."

51.     Notwithstanding the long history of evidence of the improper and illegal information-gathering techniques used by employees of the Company's subsidiaries, its Board ignored the obvious and hoped that a previous internal inquiry conducted by a law firm, which amounted to a "whitewash," would result in such conduct being ignored by the Company's regulators, its shareholders, its victims, Scotland Yard, and the British Parliament. This long-practiced conduct finally came to serious public attention in 2010 and has, only recently, spun out of the Murdochs' control.

52.     On or around July 17, 2011, despite her resignation and subsequent arrest, Brooks reportedly received an estimated $5.6 million (or £3.5 million) as part of a severance package from the Company. Similarly, *News of the World*'s last editor, Colin Myler, is expected to be paid £2.0 million in severance, and two of the Company's senior lawyers, Jon Chapman and Tom Crone, are expected to be paid £1.5 million each in severance. It is believed Hinton's severance package may well exceed all of the foregoing payments. In the cases of Brooks and

Hinton, any such payments amount to a waste of the Company's assets, since each resigned voluntarily and neither is entitled to any severance or similar compensation, which amounts to gifts under the circumstances.

D.   **Nepotism**

53.      Over the years, in order to ensure that the Company will remain in the Murdoch family's control, Rupert has improperly caused his sons, James and Lachlan, to be appointed to major operational positions within News Corp. and its subsidiaries, regardless of the appropriateness of such appointments. Rupert's practice has continued with his daughter, Elisabeth Murdoch ("Elisabeth"), as well.

54.      Indeed, in *The Financial Times* of January 29, 2011, it is reported with respect to Rupert: "As he approaches his ninth decade, he remains firmly in charge of [sic] the family's media business, and of who will succeed him."

55.      As a result of Rupert's domination of the Company and its Board, all of whose members he hand-picked, News Corp. purchased the money-losing record label run by James, Rawkus Records, in order to bring him into the Company.

56.      In order to bring Elisabeth into the management and Board of News Corp. after a 10-year absence, the Murdochs caused the Company to agree to acquire for $674 million the Shine Group ("Shine"), a production company founded by her and of which she owned 53% of the equity. Not coincidentally, Shine retained JPMorgan Chase & Co. ("JPM") to advise Elisabeth and Shine as to the fairness of such a transaction, despite the fact that JPM is already the Company's advisor as to the now-derailed acquisition of the remainder of BSkyB that it does not already own. In connection with the acquisition of Shine, Rupert promised Elisabeth a seat

on the Company's Board.

57.     But for the fact that Elisabeth is Rupert's daughter, the Company would not have considered making the Shine acquisition, which is at a grossly excessive price.  In connection with the motivation for such a transaction, which is unfair to the Company and a waste of its assets, *The Wall Street Journal* of January 15, 2011 said: "A person briefed on News Corp.'s thinking said senior News Corp. managers have long considered an acquisition of Shine an 'inevitable' way to bring Ms. Murdoch to the company."

58.     Notwithstanding the unfairness of the transaction to the Company, its Audit Committee, consisting of purportedly "independent" directors, and the entire Board, "rubber stamped" the transaction before it was consummated in April, 2011.  Thus, as a result of such transaction, the Company has been induced by the Murdochs to expend hundreds of millions of dollars unjustly, thereby wasting News Corp.'s corporate assets.

E.     **The Company Is Being Used Improperly For Rupert's Political Purposes**

59.     Over a period of many years, Rupert has used assets of News Corp. to further his personal political agenda, interests and philosophy.  In 2009 and 2010, he caused the Company to make million-dollar donations to the Republican Governors Association ("RGA") and U.S. Chamber of Commerce ("Chamber").  News Corp. donated $1 million to the Chamber months before the political group outlined plans to water down anti-bribery laws which could have punished colleagues of the Murdochs in connection with their violations of the FCPA.  A further $1.25 million was donated to the RGA.  News Corp. was the top donor to the RGA in 2010, according to research by the Center for Responsive Politics.

60.     In October, 2010, Rupert acknowledged that the RGA contribution came about as

a result of his friendship with former Fox anchor and then-Ohio Republican gubernatorial

candidate, John Kasich. Rupert has been quoted in *Politico* as saying that his $1 million

contribution to the RGA "had nothing to do with" News Corp., and was based on his personal

friendship with Kasich. At the 2010 Annual Meeting of Shareholders, Rupert admitted that the

contribution to the RGA "had nothing to do with Fox News, not News Corp."

61.     Notwithstanding Rupert's acknowledgement of his personal waste of the

Company's assets, the Board did nothing to seek to recover these and other funds misspent for

Rupert's personal purposes. Further, in response to requests for greater transparency to

shareholders about the Company's political donations, Rupert said: "We've considered [that]

from time to time. I don't believe we'll be doing it again. We'll see."

62.     Following shareholder pressure at last year's Annual Meeting and in the wake of

the ever-widening phone hacking scandal, News Corp. has adopted a "new policy to publicly

disclose corporate political contributions annually on the Company's corporate web site." The

policy states:

> On April 12, 2011, News Corporation's Board of Directors
> adopted a new policy to publicly disclose corporate political
> contributions annually on News Corporation's corporate web site
> (www.newscorp.com). News Corporation will post on its web site
> all corporate political contributions made in the 2011 calendar year
> by January 16, 2012. As part of instituting this policy, News
> Corporation intends to provide transitional disclosure on its web
> site of all corporate political contributions made from January
> 2011 through June 2011 by July 15, 2011.

63.     Although the Board appears to have changed corporate policy in the wake of the

hacking scandal, to date, it has taken no action to recover from Rupert or anyone else at the

Company the millions of dollars wrongfully spent by them to further their personal political

-31-

agendas and philosophies.

F.    **Damages to the Company**

64.    To date, the Company has sustained massive financial and reputational damages due to the conduct of News International and News America officers as described above, in amounts which cannot presently be calculated and which damages will continue to grow.

65.    In the wake of the unfolding scandal, in addition to increasing active Scotland Yard and Parliamentary investigations, the FBI has commenced an investigation of the Company's possible criminal activities, including possible cybercrimes, public corruption and white-collar crime, and the SEC is believed to be investigating Brooks' admission that the Company paid bribes for information.  It is likely that the United States Congress will commence investigations of the Company, the conduct of its management and its power in the media industry.

66.    According to *The New York Times* of July 18, 2011, "The damage is likely to continue to mount, perhaps because the underlying pathology is hardly restricted to those who have taken the fall."  This is particularly so as the approximately known 4,000 victims of *News of the World*'s hacking learn of their having been targeted.  Similarly, other victims of the same or similar practices by other publications and subsidiaries will come to light.  In 2009 alone, the Company paid out $1.6 million to settle claims related to the *News of the World* hacking scandal, as well as hundreds of thousands of dollars in legal expenses related thereto and, in the United States, it paid out, through News America, almost $700 million to obtain releases for conducting illegal and/or otherwise improper conduct.

67.    What may result in even greater damage to the Company and its shareholders is

the fact that in the wake of the hacking scandal and the subsequent disclosures, there has been renewed interest in breaking up News Corp. through legislative means. Similarly, leading members of Parliament have asked the British government to investigate whether News Corp. is a "fit and proper" owner of its stake in BSkyB, of which James is Chief Executive, possibly causing it to divest its shareholdings therein.

68. In addition to the above damages and potential damages, Standard & Poor's has warned that it might lower the Company's credit ratings because "recent events have materially increased its reputational, management and litigation risks." Indeed, any such lowering would materially increase the Company's cost of borrowing.

## DERIVATIVE ALLEGATIONS

69. Rupert and the Murdoch Family Trust, which Rupert controls, own beneficially approximately 39.7% of the Company's Class B common stock outstanding, which gives them voting control of News Corp. These Class B shares are the only common stock which has voting power; the Class A shares having none.

70. Although the Murdochs own only about 12% of the total equity of the Company, by reason of their ownership of voting control, they treat News Corp. as their personal fiefdom. The Company is routinely referred to as Rupert's and has become, in practical effect, an appendage to him. *The New York Times* has said on July 19, 2011 with respect to Rupert: "…[H]e controls [the Company] lock, stock and barrel."

71. Through his family's Class B stock holdings, Rupert nominates all members of the Company's Board, who serve at his pleasure. Thus, he has absolute control over the Company and its Board.

72. As reported by *The Financial Times* on July 19, 2011, in quoting a person close to the Board, the Directors were "perfectly aligned" behind Rupert and "There is no daylight between management members of the Board and independent members." Despite being so described by the Company, its supposedly "independent" directors are mocked as being anything but, as CNN Legal Analyst Jeffrey Toobin did on air on July 19, 2010 and about whom *The New York Times* said on the same day: "The board of the News Corporation might as well be named 'Friends of Rupert.'" *The New York Times* went on to say: "Despite multiple arrests stemming from the phone hacking accusations so far, not one independent board member has made a statement denouncing the company's dubious activities. Not one has publicly called for the resignation of top officials at the company. And not one has pushed for an outside investigation …" Nell Minow, a proponent of good corporate governance, is quoted as saying with respect to the Company's Board: "It is the ultimate crony board."

73. Despite years of misconduct known, and which should have been known, to each member of the Board, its members have been somnolent, suffering "collective amnesia" and an unwillingness to rock the Murdoch boat, which would have put at risk their very substantial perquisites and emoluments of holding directorships with substantial compensation, opportunities to network with the rich and famous, and otherwise.

74. As such, no pre-suit demand to commence litigation against Defendants and pursue the claims set forth herein is legally necessary or appropriate, since any such demand would be futile. Absent a replacement of the entire Board and elimination of the Murdochs' voting advantage, the Directors of the Company's Board will continue to ensure that no remedial action takes place, including any action to recover the Company's massive damages from the

wrongdoers.

75.     Plaintiff brings this action derivatively to redress injuries suffered by the

Company and caused by the breaches of fiduciary duties, waste of corporate assets, and

mismanagement of the Individual Defendants.

76.     Plaintiff will adequately and fairly represent the interests of News Corp. and its

shareholders in enforcing and prosecuting the Company's rights, and she has retained counsel

who are competent and well-experienced in shareholder derivative litigation.

## FIRST CAUSE OF ACTION
### Breach Of Fiduciary Duty Of Loyalty

77.     Plaintiff repeats and realleges each and every allegation above as if fully set forth

herein.

78.     Each of the Individual Defendants owed to News Corp. and its shareholders a

fiduciary duty of loyalty in their management and oversight of the affairs of the Company.

79.     By the conduct alleged above, the Individual Defendants breached their fiduciary

duties of loyalty to News Corp. and its shareholders by approving, acquiescing and/or ignoring

the longstanding illegal and otherwise questionable information-gathering practices conducted at

the *News of the World*, and other newspapers published by News International, as well as News

America, and acting as otherwise alleged herein in furtherance of Rupert's personal interests and

those of his family members.

80.     As a direct and proximate result of the Individual Defendants' breach of their

fiduciary duties, News Corp. and its shareholders have suffered enormous damages, including,

but not limited to:

        a.      diminution of the Company's value and price of its common stock;

    b.      ongoing, distracting investigations and proceedings, including increased governmental, police, regulatory and legislative scrutiny of the operations of the Company and its subsidiaries;

    c.      the inability to finalize the acquisition of BSkyB, which would have become accretive to the Company's revenues and earnings; and

    d.      irreparable damage to the Company, its reputation, and its business prospects.

81.    Plaintiff hereby demands that the Individual Defendants repay the Company its damages.

## SECOND CAUSE OF ACTION

### Breach Of Fiduciary Duties For Failing To Properly Oversee And Manage The Company

82.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

83.    By reason of their fiduciary relationships with News Corp., the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

84.    By reason of the wrongdoing alleged herein, the Individual Defendants, and each of them, violated and breached their fiduciary duties of good faith, fair dealing, loyalty, and due care, as well as of reasonable inquiry, oversight, and supervision.

85.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, News Corp. has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

86.    As a result of the misconduct alleged herein, the Individual Defendants and each of them are liable to the Company.

87.     Plaintiff hereby demands that the Individual Defendants repay the Company its damages.

## THIRD CAUSE OF ACTION
### Waste Of Corporate Assets

88.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

89.     As a result of the misconduct alleged herein, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused News Corp. to incur (and the Company will continue to incur) significant legal liability and/or expenses to defend itself, as well as to answer to numerous governmental investigations and inquiries, as a result of Defendants' unlawful and/or otherwise inappropriate actions.

90.     As a result of the unjustified purchase of Shine by the Company for excessive consideration which, *inter alia*, enriched Elisabeth, and the continued employment and providing directorships to Rupert's children, the Company's assets have been wasted and it has been badly damaged.

91.     As a result of the political contributions made by the Company for the personal benefit of Rupert and others designated by him, as well as the improper severance payments to, *inter alia*, Brooks and Hinton, the Company's assets have been further wasted, as set forth above.

92.     As a result of such waste of corporate assets, the Individual Defendants are liable to the Company.

93.     Plaintiff hereby demands that the Individual Defendants repay the Company for

its wasted assets.

## FOURTH CAUSE OF ACTION
### Gross Mismanagement

94.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

95.     The Individual Defendants had and have a duty to News Corp. and its shareholders to prudently supervise, manage, and control the operations of the Company.

96.     The Individual Defendants, by their actions and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of News Corp. in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence and candor in the management and administration of News Corp.'s affairs and in the use and preservation of the Company's assets.

97.     During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks associated with the misconduct alleged herein, yet they caused, acquiesced, or ignored that the Company was engaged in such wrongdoing, which they knew had an unreasonable risk of damage and/or unjustified expense to News Corp., thus breaching their duties to the Company.

98.     As a result thereof, the Company has been damaged.

99.     Plaintiff hereby demands that the Individual Defendants repay the Company its damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

a.      Declaring that the Individual Defendants have breached their fiduciary duties to News Corp., wasted its assets, and engaged in gross mismanagement of the Company;

b.      Awarding News Corp. full compensatory damages against the Individual Defendants, jointly and severally, in an amount to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

c.      Requiring the Individual Defendants to remit to the Company all of their salaries and other compensation received for the periods during which they breached their duties;

d.      Ordering that the Individual Defendants and those under their supervision and control refrain from any further such unlawful activities as are alleged herein, and to immediately implement corrective measures, including a system of internal controls and procedures sufficient to prevent the repetition of the acts complained of, which will rectify all such wrongs as have been committed and to prevent their recurrence;

e.      Requiring that the Individual Defendants establish new corporate governance procedures which would have the effect of decreasing the likelihood that the type of conduct described in this Complaint would reoccur;

f.      Awarding full voting rights to the Company's Class A shares;

g.      Pending the next meeting of News Corp.'s shareholders at which all shareholders have equal voting rights, appointing a Conservator to oversee the Company's operations;

h.      Awarding Plaintiff reasonable attorneys' fees and costs and all other recoverable expenses of litigation; and

i.    Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all issues so triable.

Dated:  July 22, 2011                              Respectfully Submitted,

Richard D. Greenfield (RG-4046)
Greenfield & Goodman, LLC
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone: (917) 495-4446
Facsimile: (212) 355-9592
Email: whitehatrdg@earthlink.net

Patrick A. Klingman (PK-3658)
Shepherd, Finkelman, Miller & Shah, LLP
65 Main Street
Chester, CT  06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
Email: pklingman@sfmslaw.com

Scott R. Shepherd
Shepherd, Finkelman, Miller & Shah, LLP
35 E. State Street
Media, PA 19063
Telephone:  (610) 891-9880
Facsimile:  (610) 891-9883
Email: sshepherd@sfmslaw.com

*Attorneys for Plaintiff*

# VERIFICATION

I, G.E.Stricklin, hereby declare and verify as follows:

I am the plaintiff in the above-captioned case. I have read the contents of the

foregoing Complaint. I am informed and believe that the facts related therein

are true, based upon facts as related to me by my counsel, and on that

ground, I verify that the facts stated therein are true.

G.E.Stricklin