## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| G.E. STRICKLIN, Derivatively On Behalf of NEWS CORPORATION, ) ) ) Plaintiff, ) ) v. ) ) K. RUPERT MURDOCH; PETER L. BARNES; CHASE CAREY; KENNETH E. CROWLEY; DAVID DeVOE; VIET DINH; JAMES R. MURDOCH; LACHLAN K. MURDOCH; THOMAS J. PERKINS; ARTHUR M. SISKIND; JOEL KLEIN; LES HINTON; and PAUL CARLUCCI, ) ) ) ) ) ) ) ) ) ) ) Defendants, ) ) and ) ) NEWS CORPORATION, ) ) Nominal Defendant. ) | Civil Action No. 11-civ-05073 (PGG) ECF Case SECOND AMENDED COMPLAINT |

Plaintiff, G. E. Stricklin ("Plaintiff"), by and through her undersigned attorneys, alleges, upon personal knowledge as to herself and her own acts, and as to all other matters, upon information and belief based upon, *inter alia*, the investigation conducted by her attorneys, as follows:

### NATURE OF ACTION

1.     This is a shareholders' derivative action brought in the wake of more than a decade of bad faith disregard by the Board of Directors (the "Board") of News Corporation ("News Corp." or the "Company") of its fiduciary and other duties. It is brought under and pursuant to Federal Rule of Civil Procedure 23.1 and the common law by a beneficial

shareholder of News Corp., on behalf of the Company against certain members of its Board[1] and

certain members of its senior management (the "Individual Defendants" or, collectively,

"Defendants," as defined below), to remedy the violations of law by the Individual Defendants

and their subordinates, including breaches of fiduciary duties, obstruction of justice, waste of

corporate assets, and other conduct contrary to the interests of News Corp. and its shareholders,

which have caused, and are continuing to cause, substantial monetary losses to the Company and

other damages, such as to its reputation, goodwill, standing in the business community, and loss

of business opportunities.[2]  In addition, this action is brought pursuant to Section 14(a) of the

Securities Exchange Act of 1934 (the "Exchange Act") arising from the false and/or misleading

statements made by the Board in the Company's proxy statements and the failure to disclose

material adverse facts about, *inter alia*, the Company's utter lack of adequate internal controls,

the nominees to the Board and other material facts.

      2.      The illegal and illicit conduct described herein is a direct consequence of the near-

total breakdown of effective corporate governance by the Company's Board, a body which in the

past and to this day "rubber stamps" the decisions made by Defendant K. Rupert Murdoch

("Rupert") and members of his family.  All of this conduct, and the damages it has caused, has

occurred against the backdrop of a Board beholden to Rupert.  Indeed, the news media and

commentators frequently refer to News Corp. as if it is synonymous with the name "Murdoch."

Even as much of the wrongdoing alleged herein was being revealed publicly, Rupert proclaimed

at an August 2011 news conference that, despite massive criticism of the Board's lack of

---

[1]  Although all members of the Board, since 2005 through the present, are responsible for most of the wrongdoing set forth herein, not all of the directors have been named as defendants due to the passage of time and/or for other reasons.

[2]  Unless the context indicates otherwise, all references to News Corp. and/or the Company herein refer, as well, to all subsidiaries thereof.  All references to the Individual Defendants named herein and/or other persons of interest refer to them and/or their respective subordinates and to other persons whose activities were supervised by them.

independence, he planned no changes to the Board.  Although Rupert's proclamation has since been rescinded in connection with several resignations from the Board, he has hand-picked replacements and remains in total control of the Board and its composition.

3.      News Corp., one of the world's biggest media conglomerates, has been brought to its knees as a consequence of the Board's subservience, including a disastrous still-unfolding scandal involving the unscrupulous practices of its senior officers at its American and British subsidiaries, most of which practices and their consequences were well-known or should have been known to the Board over the multi-year period when such activities were taking place.

4.      These scandals date back to the 1990s, if not earlier, and have had massive consequences on the Company.  With Board acquiescence, the Company has spent staggering sums of money (already in excess of $200 million) to conceal from the investing public, regulators, and News Corp.'s own shareholders, as well as to defend against and/or settle claims asserted by the victims of the Company's wrongful conduct.  The conduct specified below has resulted in litigation against the Company's subsidiaries and employees, and cooperating witnesses, including former employees, have been "bought off" with over $2 billion of News Corp. assets through asset purchases, payment of legal fees, and other deceptive means to conceal such conduct and the expenses of compensating the victims.  Further, now that the activities of senior management of the Company and its subsidiaries have been exposed throughout the world, new victims are coming forward virtually weekly, thereby subjecting News Corp. to billions of dollars of additional damages.  Moreover, the Company is now the subject of ever-increasing investigations by the British Parliament, Scotland Yard, the Federal Bureau of Investigation ("FBI"), and the Securities and Exchange Commission ("SEC"), among others.  Such investigations include federal investigations of the Company's now-admitted

payment of bribes to foreign officials (violations of the Foreign Corrupt Practices Act ("FCPA"))
and computer hacking within the United States (violations of the Computer Fraud and Abuse Act
("CFAA")).

      5.      As a direct consequence of the now widely-publicized telephone hacking and
bribery scandal in Great Britain, in the hope of protecting Rupert, his son, Defendant James
Murdoch ("James") and their intimate colleagues, the Board, at great cost to the Company,
recently shuttered *News of the World*, a 168-year-old, tabloid-style newspaper operated by a
News Corp.'s London-based subsidiary, News International, Ltd. ("News International") As a
direct result of the still-unfolding scandal, which involves "cell phone hacking," another illegal
practice known as "pinging,"[3] and the alleged bribery of public officials in the United Kingdom,
the United States, and possibly elsewhere, News Corp. has now abandoned its $12 billion bid to
acquire the remainder of British Sky Broadcasting ("BSkyB"), as News Corp.'s stock price
eroded in the wake of the scandal by approximately 15% since the end of May, 2011.[4]   The
Company and its subsidiaries are the subject of criminal investigations and hearings both in the
United States and Great Britain, and senior executives are abruptly resigning or being arrested by
Scotland Yard.[5]  There have been 12 such arrests to date, including Rebekah Wade Brooks
("Brooks") and her husband, Charles Brooks.

---

[3] Greg Miskiw, a former Editor of *News of the World*, has now admitted that his publication engaged in
"pinging," pursuant to which British police were paid to use their proprietary technology to pinpoint a
person's location at about $500 per request.
[4] Market prices of the Company's shares substantially rebounded once Rupert announced that the cash
freed up by the fall-out of the BSkyB acquisition would be used for a share buy-back.
[5] The Company regarded BSkyB, a planned "engine for growth," as a "crown jewel" and the
abandonment of the takeover bid, in the wake of great public criticism, was a very costly blow.
Defendant David E. DeVoe ("DeVoe"), the Company's Chief Financial Officer, has indicated that News
Corp. has no plans to try to bid for BSkyB again.  The cash stockpiled for this acquisition is now being
paid out, in part, for a share buy-back and an increase in dividends.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction in this case arising under Article III of the United

States Constitution and 28 U.S.C. § 1331.  This Court also has supplemental jurisdiction,

pursuant to 28 U.S.C. § 1367(a), over all other claims that are so related to claims over which

this Court may exercise original jurisdiction in that they form part of the same case or

controversy.  With respect to these claims, this Court has jurisdiction pursuant to 28 U.S.C. §

1332(a)(1), in that Plaintiff and Defendants are citizens of different states and the amount in

controversy exceeds $75,000, exclusive of interests and costs.  This action is not a collusive one

designed to confer jurisdiction on this Court that it would not otherwise have.

7.      This Court has jurisdiction over the Defendants named herein because each is

either a corporation that conducts business in and maintains operations in this District, or each is

an individual with sufficient minimum contacts with this District so as to render the exercise of

jurisdiction by this Court over him or her permissible under traditional notions of fair play and

substantial justice.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because: (i) News

Corp. maintains its principal place of business within this District; (ii) one or more of the

Individual Defendants resides in or maintains offices in this District; (iii) a substantial portion of

the transactions and wrongs complained of herein took place within this District; and (iv)

Defendants have received substantial compensation in this District by doing business here and

engaging in numerous activities that had effects in this District.

## THE PARTIES

9.      Plaintiff is a current shareholder of News Corp., and has continuously been, as

successor in interest, a representative and/or beneficial owner of the Company's Class A

common stock and Class B common stock at all times relevant herein. Such shares have been owned in her family for more than 15 years. Plaintiff is entitled to vote at the Annual Meeting of News Corp. stockholders (the "2012 Annual Meeting"), as she has been in previous years. Plaintiff is a citizen of the State of Florida.

10.     Nominal Defendant, News Corp. is a Delaware corporation, reincorporated from a South Australia company in 2004, with its principal offices located at 1211 Avenue of the Americas, New York, New York. News Corp. describes itself as a diversified global media company, and its media operations include cable network programming, filmed entertainment, television, direct broadcast satellite television, and publishing, conducted in the United States, Continental Europe, the United Kingdom, Australia, Asia and Latin America. As of March 31, 2011, News Corp. had total assets of approximately $60 billion and total annual revenues of approximately $33 billion. The Company's Class A common stock is publicly traded in NASDAQ under the symbol "NWSA" and its Class B common stock is publicly traded in NASDAQ under the symbol "NWS." No claims for damages are made herein against the Company. News Corp. was created in 1979 as the holding company for News Ltd., which Rupert organized in the early 1950s and which owned several newspapers in his native Australia. In 1976, after acquiring several United States newspapers, News Ltd. purchased the *New York Post*. In 1985, the Company purchased the Metromedia group of television stations (which necessitated Rupert's becoming a United States citizen), which became the United States' fourth commercial broadcasting television network, the Fox Broadcasting Company. Another of the Company's subsidiaries, News International Ltd. (formerly News International plc) ("News International"), publishes several British newspapers, including the tabloid newspaper, *The Sun*, whose former Sunday-only version, *News of the World*, established in 1843, was reportedly the

6

largest selling English language newspaper in the world, until it discontinued operations on July 10, 2011. According to media reports on its demise, *News of the World* had special meaning for the Company, as its purchase in 1969 formed the foundation of News Corp.'s extensive British media holdings.

11. Nominal Defendant, News Corp. owns or has owned, as described below, other subsidiaries, some of which were purchased for grossly excessive prices to satisfy the personal whims and ego of Rupert, such as MySpace and Dow Jones & Company, Inc. ("DowJones"). The Company has sustained massive losses due to such acquisitions.

12. Defendant, Rupert, is the Company's Chief Executive Officer ("CEO") and Chairman of the Board, positions he has held since 1979 and 1991, respectively. Rupert has also served as a Director of the following companies: BSkyB (from 1990 to 2007); Gemstar-TV Guide International Inc. (from 2001 to 2008); The DIRECTV Group, Inc. ("DIRECTV") (from 2003 to 2008); and China Netcom Group Corporation (Hong Kong) Limited (from 2001 to 2005). As described in the Company's Definitive Proxy Statement, filed with the SEC on Schedule 14A on August 31, 2010 (the "2010 Proxy Statement"), Rupert "has been the driving force behind the evolution of the Company from the single, family-owned Australian newspaper he took over in 1953 to the global public media company it is today" and he "brings to the Board invaluable knowledge and expertise regarding the Company's history and provides strong operational leadership and broad strategic vision for the Company's future." Rupert received over $30 million in compensation from News Corp. for fiscal year 2008 and he received $22 million for fiscal years 2009 and 2010, respectively. According to the July 18, 2011 *Financial Times* report, which refers to News International as "Rupert Murdoch's UK newspaper group," the Company's "culture is [so] closely identified with Rupert Murdoch and his family." Indeed,

media accounts typically do not distinguish between News Corp. and "Murdoch," they being so interwoven publicly. Rupert is a citizen of the State of New York.

13.     Defendant James, is the younger of Rupert's two sons. He was recently appointed Deputy Chief Operating Officer of the Company, the #3 position in its executive ranks. He has been a Director and the Chairman and Chief Executive, Europe and Asia, of the Company since 2007, and previously served an Executive Vice President of the Company, and served as a member of the Board from 2000 to 2003. James was the CEO of BSkyB from 2003 to 2007, and he has served as a Director of BSkyB since 2003 and as its Non-Executive Chairman since 2007. He also has served as a Director of NDS Group Limited ("NDS") since 2009. James formerly was the Chairman and CEO of STAR Group Limited, a subsidiary of the Company, from 2000 to 2003. He has served as a Director of GlaxoSmithKline plc since 2009 and as a Director of Sotheby's since May, 2010. According to the Company's 2010 Proxy Statement, James "is a key member of the Company's management team, with responsibility for the Company's European and Asian operations, [having] served in a number of leadership positions within the Company and its affiliates over the past 14 years [and] [h]is broad-based experience, extensive knowledge and strategic perspective of the Company's business and operations enable him to be a valuable resource for the Board." James was instrumental in paying "hush money" to victims (through "settlements") of the telephone hacking scandal described herein. Referring to his approval of such "settlements," James now says: "I now know that I did not have a complete picture when I did so. This was wrong and a matter of serious regret." James recently was called to testify before a committee of Parliament. During and prior to such testimony, for which he was prepared and coached by Defendant Joel Klein ("Klein"), James blatantly lied about his knowledge of the prevalence of illegal activities at News International, including, specifically,

8

telephone hacking, the payment of bribes and the buying off of victims of hacking with "hush money." James was described in the January 29, 2011 issue of the *Financial Times* as "brash and hot-tempered" and "clever and ruthless, eager to battle the media establishment, and willing to take big risks," such as trying to cover up the widespread phone hacking scandal described herein. James received over $17 million in compensation from News Corp. for fiscal year 2008 and more than $10 million for fiscal years 2009 and 2010, respectively.[6] Plaintiff is informed and believes that James is a citizen of the State of New York.

14.     Defendant Peter L. Barnes ("Barnes") has been a Director of the Company since 2004 and is a member of the Audit Committee. He has been a Director of Ansell Limited since 2001 and its Chairman since 2005. Barnes served in various senior management positions in the United States, the United Kingdom and Asia at Phillip Morris International Inc. from 1971 to 1998, including as President of Phillip Morris Asia Inc. Per the Company's 2010 Proxy Statement, he "brings to the Board the leadership, operational and financial skills gained in his several roles at Phillip Morris, as well as through his service as a Director at a number of private and public companies, including his service as Chairman of several of these companies." For the fiscal year ending on June 30, 2010, Barnes received at least $236,000, plus other benefits, for his role with the Company. Plaintiff is informed and believes that Barnes is a citizen of the State of Connecticut.

15.     Defendant Chase Carey ("Carey") has been the President and Chief Operating Officer ("COO") of News Corp. and Deputy Chairman of the Board since July 2009, having previously served the Company in numerous roles beginning in 1988, including as Co-COO from 1996 to 2002, as a consultant from 2002 to 2003, and as a Director from 1996 to 2007.

---

[6] James and each of the other Individual Defendants named herein are defendants solely with respect to their conduct while serving as officers and/or directors of the Company.

Carey has served as the Chairman of the Supervisory Board of Sky Deutschland AG, a German pay-television operator and affiliate of the Company, since July 2010. At all relevant times, he has been a close confidante of Rupert and has acted as his surrogate in many of Rupert's business dealings. Carey served as a President and CEO of DIRECTV from 2003 to 2009 and as one of its Directors from 2003 to June 2010. Carey also served as a Director of BSkyB from 2003 to 2008, as a Director of Gateway, Inc. from 1996 to 2006 and as a Director of Yell Finance B.V. from 2004 to 2007. According to the Company's 2010 Proxy Statement, "[a]s the Company's President, Chief Operating Officer and Deputy Chairman, Mr. Carey is a key member of the Company's management team ...[,] has a broad and deep understanding of the Company and its operations, having served in a variety of leadership positions within the Company and with its affiliates for over 21 years [and] brings valuable executive leadership experience to the Board, as well as unparalleled expertise in the media and satellite television industries." For the fiscal year ending on June 30, 2010, Carey received over $26 million in compensation, plus other benefits, from News Corp. Carey is a citizen of the State of Connecticut.

16.     Defendant Kenneth E. Crowley ("Crowley") has been a Director of the Company since 1979 and serves as a member of the Nominating and Corporate Governance Committee. Crowley has been the Executive Chairman of RM Williams Holdings Pty Limited, an Australian apparel company, since 1994, and served as a senior executive of News Limited, a subsidiary of the Company, from 1964 to 1997, including as its Chairman and Chief Executive from 1980 to 1997. For the fiscal year ending on June 30, 2010, Crowley received at least $231,000, plus other benefits, for his role with the Company. Plaintiff is informed and believes that Crowley is a citizen of the State of Texas.

17.     Defendant, DeVoe, has been a Director of News Corp. and its Chief Financial

Officer ("CFO") since 1990, and has served as the Company's Senior Executive Vice President

since 1996.  DeVoe has been a Director of BSkyB since 1994 and a Director of NDS Group

Limited since 1996.  He also served as a Director of Gemstar-TV Guide from 2001 to 2008 and

as a Director of DIRECTV from 2003 to 2008.  DeVoe received compensation from News Corp.

of approximately $10 million, $9 million, and $7 million, respectively, plus other benefits, for

fiscal years 2008, 2009, and 2010.  Plaintiff is informed and believes that DeVoe is a citizen of

the State of New York.

18.     Defendant Viet Dinh ("Dinh"), a lawyer, has been a Director of the Company

since 2004 and serves as Chairman of the Nominating and Corporate Governance Committee

and as a member of the Compensation Committee.  Dinh has been, at most relevant times, a

close confidante of the Murdoch family and is the godfather to one of Defendant Lachlan

Murdoch's sons, and has been a Professor of Law at Georgetown University Law Center since

1996.  He was an Assistant Attorney General for Legal Policy in the U.S. Department of Justice

from 2001 to 2003.  Through his connections with the Justice Department and with present and

former Justice Department employees, Dinh has helped to orchestrate strategies to deflect

investigations of at least some of the wrongful conduct described herein. Dinh has been the

founder and a Principal of Bancroft Associates PLLC since 2003 and of Bancroft Capital

Management since 2006.  He has served as a Director of M&F Worldwide Corp. ("M&F"),

controlled by Ronald O. Perelman ("Perelman") since 2007.  According to the Company's 2010

Proxy Statement, Dinh "offers the Company his experience, intellect and acute knowledge of and

contacts within the U.S. government [and because] [h]e teaches on issues of corporate

governance [, he] brings to the Board and the committees on which he serves corporate

11

governance expertise, which is also strengthened by his service on the boards of other public companies." In fact, Dinh was, and is, intimately involved in the operations of Strayer Education, Inc. ("Strayer"), presently under investigation by the SEC and the Federal Trade Commission and in private litigation in connection with allegations of securities fraud, fraudulent marketing of Strayer to potential students, and otherwise. Dinh, by reason of his positions with Strayer, has actively participated in covering up the wrongdoing of Strayer and its senior officers. Dinh is also a colleague of Perelman's and, in serving on the Board of M&F, has facilitated Perelman's decades-long predatory business strategies in derogation of shareholder rights. Notwithstanding his personal complicity in and knowledge of at least some of the wrongful conduct alleged in this Complaint and pre-disposition against high standards of corporate governance as exemplified by his roles at Strayer and M&F, in furtherance of the Board's efforts to "whitewash" the other Defendants herein as well as colleagues of the Murdochs implicated in such conduct. His fellow directors, at Rupert's behest, appointed Dinh as one of two purportedly independent members of a "special committee" of the Board charged with investigating the Company's phone hacking scandal. Dinh is not independent, disinterested or otherwise competent to conduct such an investigation fairly and in the best interests of the Company and its public shareholders. For the fiscal year ending on June 30, 2010, Dinh received at least $258,000, and other benefits, for his role with the Company. Plaintiff is informed and believes that Dinh is a citizen of Washington, D.C.

19.     Defendant Lachlan K. Murdoch ("Lachlan") is the older of Rupert's two sons. He has been a Director of the Company since 1996, has served as an advisor to the Company from 2005 to 2007, and served as its Deputy COO from 2000 to 2005. Lachlan was a Director of NDS Group Limited from 2002 to 2005. Since 2005, when he resigned abruptly due to, *inter*

*alia*, disagreements with Rupert, he has served as the Executive Chairman of Illyria Pty Ltd., a private investment company.  The Company's 2010 Proxy Statement states that Lachlan "has extensive experience serving in several senior leadership positions within the Company, in particular as head of News Limited, the *New York Post* and as the Deputy Chief Operating Officer of the Company."  Lachlan received almost $2 million, together with other benefits, for his role with the Company for the fiscal year ending on June 30, 2010.  Plaintiff is informed and believes that Lachlan is a citizen of the State of New York.

20.    Defendant Thomas J. Perkins ("Perkins") has been a Director of the Company since 1996 and serves as a member of the Audit, Compensation, and Nominating and Corporate Governance Committees.  He has been a partner of Kleiner Perkins Caufield & Byers, a venture capital company, since 1972.  From 2004 to 2006, Perkins was a Director of Hewlett-Packard Company (H-P") during a period when H-P management was paying substantial bribes in violation of the FCPA, a practice known to, or which should have been known to, each of its Board members.  Perkins has, at relevant times, been a beneficiary of his connections with the Murdochs and introductions provided by them.  For the fiscal year ending on June 30, 2010, Perkins received at least $258,000, plus other benefits, for his role with the Company.  Perkins is a citizen of the State of California.

21.    Defendant Arthur M. Siskind ("Siskind") has been a Director of News Corp. since 1991 and Senior Advisor to the Chairman since 2005.  Effective with the 2012 Annual Meeting, Siskind will be denominated as a "Director Emeritus."  From 1991 to 2005, he was the Company's Group General Counsel, the Senior Executive Vice President from 1996 to 2005, and the Executive Vice President from 1991 to 1996.  Siskind has been a Director of BSkyB since 1991 and a Director of NDS Group Limited from 1996 to 2009.  He also was an Adjunct

Professor of Law at the Cornell Law School from 2007 to 2009 and was an Adjunct Professor of

Law at Georgetown University Law Center from 2005 to 2007. For the fiscal year ending on

June 30, 2005, Siskind received almost $4 million, plus other benefits, for his role with the

Company. Siskind is a citizen of the State of New York.

22.     Defendant, Klein, a lawyer, has been a Director of News Corp. since 2010 and

the Senior Advisor to the Chairman, principally advising Rupert as to how best to contain the

hacking scandal as it was unfolding and to direct evasive legal and other strategies in that regard.

Although a relative newcomer to the Company's Board and not personally implicated in the

hacking scandal, Klein has been intimately involved in the cover-up of the wrongdoings alleged

herein and developing strategies to protect the Murdochs and their confederates from liability,

personal embarrassment and otherwise being held accountable for the wrongdoing alleged

herein. Indeed, at the time he was being recruited to join News Corp., Klein was briefed about,

*inter alia*, the facts and circumstances surrounding the Company's potential exposure due to the

hacking scandal and other wrongful conduct of the Defendants. Klein knew, or should have

known at the time he was being recruited, that he was expected to (and would) owe personal

allegiance to Rupert, who promised him millions of dollars of compensation for his services and

a substantial increase over his former position as head of New York City's school system.[7]

Klein is expected to receive a yearly salary of $2 million, plus other direct and indirect benefits,

together with an annual bonus of at least $1.5 million, in addition to a $1 million signing bonus.

Notwithstanding his personal knowledge of at least some of the wrongdoing alleged herein

before becoming a member of the Company's Board and his role in devising strategies to protect

the Murdochs and their confederates since joining the Board, particularly after Scotland Yard

---

[7]  It has been reported in *The New York Times* that Rupert donated $1 million to an advocacy group run by Klein.

reopened its investigation of the phone hacking on January 27, 2011, his fellow directors, at the behest of Rupert, appointed Klein as one of two purportedly independent members of a "special committee" of the Board charged with investigating the phone hacking described herein.

23.    Klein is not independent, disinterested or otherwise competent to conduct such an investigation fairly and in the best interests of the Company and its public shareholders. He has become, according to *The New York Times*, "the corporate consigliere for a media titan [Rupert]…" and is a mirror image of Rupert's "take no prisoners" personality. As reported in *The Wall Street Journal* of July 19, 2011, Klein, who was labeled as a "fixer" in the article, is now one of the inner circle of advisors to whom Rupert has turned. Indeed, Klein sat immediately behind and coached Rupert and James before and as they testified before Parliament. It was further reported by *The Wall Street Journal* that Rupert had "formalized Mr. Klein's role at the center of the response to the crisis, announcing that he had selected [him] to 'provide oversight and guidance' and that Mr. Klein along with … Dinh, would keep the Board apprised." Indeed, Klein and Dinh had set up a purportedly independent management and standards committee referred to above to investigate the phone hacking scandal (although admitted, the Company still calls the hacking "allegations.") The supposedly independent committee, to be nominally headed by a commercial lawyer, Anthony Grabiner, will report to Klein who, in return, will report to Dinh. Defendants Klein and Dinh are the two principal architects of the Murdoch family's present legal defense strategies and those strategies are designed to limit the ongoing and future investigations of News Corp. so that they are focused on "a few rogue employees." This proposed investigation has all the earmarks of a "whitewash" of the Murdochs inasmuch as Mr. Grabiner, who sat behind Rupert and James at their Parliamentary testimony, is hardly objective and is believed to have joined with Klein in the

preparation and coaching of the Murdochs. Notwithstanding his role in developing strategies to

protect the Murdochs, according to a front page story in *The New York Times* on July 24, 2011

about Klein entitled, "Murdoch's Unlikely Ally," Klein said to a friend, "I am trying to get as far

away from this as I can." Klein is a citizen of the State of New York.

24.     Defendant Les Hinton ("Hinton") is a long-time associate and confidante of

Rupert, having worked for him for more than 52 years, most recently as CEO of Dow Jones, the

parent of, *inter alia, The Wall Street Journal*. At all relevant times, Hinton was CEO of News

International, Inc. According to *The Wall Street Journal* on July 16, 2011, "The company is

eager to wall off the properties Mr. Hinton has lately overseen—including *The Wall Street*

*Journal* and *Dow Jones* Newswires—from the messy British tabloid scandal." Hinton resigned

voluntarily in the wake of the unfolding hacking scandal. Hinton is a citizen of the State of New

York.

25.     Defendant Paul V. Carlucci ("Carlucci") is the Chairman and CEO of News

America Marketing ("News America"), an obscure but lucrative subsidiary of News Corp., as

well as Publisher of the *New York Post*. Carlucci is a citizen of the State of New York.

## PERSONS OF INTEREST

26.     Brooks was the former CEO of News International, Ltd., who resigned from her

position just prior to being arrested by Scotland Yard on July 17, 2011 in connection with the

hacking and bribery conduct described herein.[8]   She has engaged personally in illicit and/or

illegal information-gathering involving, *inter alia*, breaking and entering and installing voice

---

[8] Brooks' substitute at News International is to be Tom Mockridge, Chief Executive of Sky Italia since
2003. Mockridge, apparently at the behest of Rupert, caused Sky Italia to refuse to carry broadcasting by
a cable network, Current TV, because it had hired liberal political news commentator, Keith Olbermann,
who had a long history of being highly critical of Rupert.

recording equipment to obtain stories.  On September 26, 2012, Brooks and six of her former colleagues were remanded for trial in September 2013 on such charges.

27.    According to *The Wall Street Journal* of July 18, 2011, "Such tactics earned [Brooks] a rapid rise through the ranks and became the *News of the World's* editor in 2000 and, later … of *The Sun*."  During this period, her relationship with Rupert was solidified and, even after her arrest in 2005 on suspicion of assaulting her husband, she was promoted by Rupert to head News International.

28.    Piers Morgan ("Morgan"), now employed by CNN in New York, testified before an investigatory Committee of the British Parliament that the hacking practices overseen by Brooks were "standard journalistic tools."  While Morgan denied personally employing such "tools," he nevertheless defended their use during his tenure as an Editor at *News of the World*, saying: "How much privacy are you entitled to if you yourself use your privacy for commercial gain?  I have very little sympathy with celebrities who sell their weddings for a million pounds … and then expect to have privacy if they get caught having affairs, for example, it seems to me a nonsensical position to adopt."  Brooks, following the lead of Rupert, was a principal promoter of such a culture, which promoted breaching privacy for commercial gain, and remains unapologetic. This culture, including bribery of police and others for confidential information, was well-known to the Board, which never took any steps to curtail it.

29.    Elaine L. Chao ("Chao") has been nominated to fill a forthcoming vacancy on the Company's Board.  She is a political operative, former Fox News commentator and former Secretary of Labor in the George W. Bush administration. Chao is married to Senator Mitch McConnell ("McConnell"), to whom Rupert has made substantial direct cash contributions, and contributed indirectly to his political action committee, the "Bluegrass Committee," since 1990.

Chao and McConnell are close personal friends of Rupert and his wife and attend many social events together. Chao is a defendant in shareholder litigation alleging breach of fiduciary duty, waste of corporate assets and not acting in the best interests of a publicly-owned company and its shareholders. Chao's election as a Director of the Company is a virtual certainty given the Murdochs' control of the voting process. She is being described falsely in the 2012 Proxy Statement as being, once she joins the Board, an "independent director." Given her close personal relationship to Rupert and his wife and the other ties that bind them, Chao is not and cannot be expected to act in any way other than in the Murdochs' best interests.

30.     Alvaro Uribe Velez ("Uribe") has been nominated to fill a forthcoming vacancy on the Company's Board. Uribe is the former President of Colombia, and has been charged by the head of the Congressional Accusations Commission of the Colombian Congress with personal involvement in a massive wiretapping scandal. In that regard, Colombian Congressman Yahir Acuna -- head of the Commission which is investigating Uribe's involvement -- says testimony from intelligence agents has consistently indicated that Uribe not only knew about the illegal wiretapping of political opponents, but ordered it himself. It is alleged that opposition politicians, Supreme Court magistrates, human rights organizations and journalists were spied on during Uribe's eight years in office. Acuna said that the mounting evidence against Uribe means the investigation should now move from its preliminary stage to formal charges being brought against the former president for conspiracy, abuse of power and the illegal use of communication equipment. Colombia's Inspector General, Alejandro Ordoñez, had previously ordered Congress to investigate former President Uribe for his role in the illegal wiretaps on the basis of intelligence officials' testimonies incriminating Uribe. The former president's former chief of staff is in jail awaiting trial while his former spy chief fled the country before charges were filed.

18

In addition to the foregoing conduct, according to Colombia Reports, 9 May 2008, Uribe has also been officially investigated for bribery, but not formally charged to date. Notwithstanding these charges and other indicia of illegal conduct, which apparently have been well-documented, Rupert, who was well aware of them, brazenly proposed Uribe as a new Director. Uribe's election as a Director of the Company is a virtual certainty given the Murdochs' control of the voting process. He is being described falsely in the 2012 Proxy Statement as being, once he joins the Board, an "independent director."

31.     Upon information and belief, Chao and Uribe are being proferred as "independent directors" to create the illusion that the Board has conducted investigations in the past and can "cleanse" itself with the new appointments. Given Chao's personal entanglements and the various charges made against Uribe and otherwise, neither of these nominees can function as independent or disinterested, particularly with respect to addressing the pervasive criminality and other wrongdoing described herein. Indeed, after the nominees were put forth, *Reuters* commentator Jeffrey Goldfarb said of Chao and Uribe:

> "But neither looks up to the task of challenging the News Corp. chairman
> and chief executive on how he runs his corporation. Despite some turnover
> over the past year, the board is still stacked with Murdoch's children,
> lieutenants, cronies and other supine directors."

32.     Natalie Bancroft ("Bancroft") has been a Director of the Company since 2007. In connection with the Company's 2007 $5.6 billion acquisition of Dow Jones, which was controlled and owned by the Bancroft family, an agreement was reached whereby the Company agreed to elect a member of the Bancroft family or another mutually agreed-upon individual to the News Corp. Board. Bancroft is a professionally trained opera singer, has studied journalism and is a graduate of the L'Institut de Ribaupierre in Lausanne, Switzerland. For the fiscal year

ending on June 30, 2010, Bancroft received at least $220,000, plus other benefits, for her role with the Company.

33.     Roderick I. Eddington ("Eddington") has been a Director of the Company since 1999 and serves as the Chairman of the Audit Committee and as a member of the Compensation Committee. Eddington has served as Non-Executive Chairman, Australia and New Zealand of J.P. Morgan, since 2006. From 2000 to 2005, he served as a Director and the Chief Executive of British Airways plc, and from 1992 to 1996, he was the Managing Director of Cathay Pacific Airways. Eddington has been a Director of John Swire & Sons Pty Ltd. since 1997, a Director of Rio Tinto plc since 2005 and a Director of CLP Holdings Limited since 2006. He also served as a Director of Allco Finance Group Limited from 2006 to 2009. For the fiscal year ending on June 30, 2010, Eddington received at least $274,000, and other benefits, for his role with the Company.

34.     Andrew S.B. Knight ("Knight") has been a Director of the Company since 1991 and serves as Chairman of the Compensation Committee and as a member of the Audit Committee. He announced his resignation as a Director effective at the 2012 Annual Meeting of shareholders. Knight was the Chairman of News International, a subsidiary of the Company, from 1990 to 1995, and he also served as the CEO of Daily Telegraph plc from 1986 to 1989 and as an Editor of *The Economist* magazine from 1974 to 1986. Knight has been the Chairman of J. Rothschild Capital Management Limited since 2008. He also served as a Director of Templeton Emerging Markets Investments Trust from 2003 to 2008 and as a Director of Rothschild Investment Trust Capital Partners plc from 1997 to 2008. Knight was also a Director of The Reader's Digest Association, Inc. from 2007 to 2009. For the fiscal year ending on June 30, 2010, Knight received at least $281,960, and other benefits, for his role with the Company.

35.    John L. Thornton ("Thornton") has been a Director of the Company since 2004 and serves as a member of the Compensation, Nominating, and Corporate Governance Committees. He has announced his resignation as a Director effective at the 2012 Annual Meeting of shareholders. Thornton has been a Professor and Director of Global Leadership at Tsinghua University School of Economics and Management in Beijing since 2003 and a Director and Non-Executive Chairman of HSBC North America Holdings Inc. since 2008. He was also President and Co-COO of The Goldman Sachs Group, Inc. from 1999 until 2003 and a Senior Advisor to Goldman Sachs from 2003 to 2004. In addition, Thornton has been a Director of the Ford Motor Company since 1996, a Director of China Unicom (Hong Kong) Limited since 2008, and a Director of HSBC Group Holdings since 2008. He was also a Director of The Industrial and Commercial Bank of China Ltd. from 2005 to 2008, a Director of China Netcom Group Corporation (Hong Kong) Ltd. from 2004 to 2008, and a Director of Intel Corporation from 2003 to May 2010. For the fiscal year ending on June 30, 2010, Thornton received at least $242,000, plus other benefits, for his role with the Company.

36.    Unless otherwise noted, Rupert, James, Carey, DeVoe, Hinton, Carlucci, and Siskind are referred to herein collectively as "Officer Defendants," and Rupert, James, Carey, DeVoe, Siskind, Barnes, Crowley, Dinh, Lachlan, Perkins and Klein, are referred to herein collectively as "Director Defendants." The Officer Defendants and Director Defendants are collectively referred to as "Individual Defendants," and with News Corp., as "Defendants." All of the Defendants are citizens of states other than Florida and there is complete diversity between Plaintiff and each Defendant.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.    In committing the wrongful acts alleged herein, the Individual Defendants have

pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with,

and conspired with, one another in furtherance of their common plan or design.  In addition to

the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants

further aided, abetted, and/or assisted each other in breach of their respective duties.

38.    In furtherance of this plan, conspiracy and course of conduct, the Individual

Defendants collectively and individually took the actions set forth herein.

39.    The Individual Defendants engaged in a conspiracy, common enterprise and

common course of conduct that caused the Company to conceal the true facts that News Corp.

was misrepresenting the adequacy of its internal controls and violating applicable laws.

40.    During all times relevant hereto, the Individual Defendants collectively and

individually initiated a course of conduct that was designed to, and did:

      a.    Conceal the fact that the Company was improperly misrepresenting its

internal controls in order to allow a widespread scheme of illicit phone hacking and other

behavior to occur at the Company's subsidiaries; and

      b.    Deceive the investing public, including shareholders of News Corp.,

regarding the Individual Defendants' management of News Corp.'s operations.

41.    Each of the Individual Defendants aided and abetted and rendered substantial

assistance in the wrongs complained of herein.  In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted the accomplishment of that

wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

**A.    Fiduciary Duties Of The Individual Defendants**

42.    By reason of their positions as Officers, Directors, and fiduciaries of News Corp. and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed News Corp., and its shareholders, fiduciary obligations of loyalty, good faith, and candor, and were and are required to use their utmost ability, to control and manage News Corp. and its subsidiaries in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

43.    Each of the Directors and Officers of the Company owes to News Corp., and its shareholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as Officers and Directors of a publicly-held company, the Individual Defendants and persons of interest referred to herein had a duty to promptly disseminate accurate and truthful information with regard to News Corp.'s operations, performance and management, among other things, so that the market price of the Company's common stock would be based on truthful and accurate information.

44.    Each of the Individual Defendants was an agent of each of the other Individual Defendants and of News Corp., and was at all times alleged herein acting within the course and scope of such agency.

45.     The Individual Defendants, because of their positions of control and authority as Directors and Officers of News Corp. and/or its subsidiaries, were able to and did, directly and/or indirectly through their subordinates such as Brooks, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with News Corp., each of the Individual Defendants had knowledge of material, non-public information regarding the Company not disclosed to News Corp. shareholders in its proxy statements and otherwise.

46.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of News Corp. By virtue of such duties, the Individual Defendants were required to, among other things:

a.     Ensure that the Company and all its employees fully complied with its legal obligations and requirements, including acting only within the scope of its legal authority, disseminating truthful and accurate statements to the SEC and the investing public, and abiding by laws governing news-gathering, payment of bribes and otherwise;

b.     Conduct the affairs of the Company in an efficient, legal, ethical and business-like manner so as to make it possible to provide the highest quality performance of their business, to avoid wasting the Company's assets, and to maximize the value of News Corp. and its common stock;

c.     Remain informed as to how News Corp. and its subsidiaries conducted their operations and, upon receipt of notice or information of imprudent, unsound or questionable conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices, to make such disclosures as necessary to comply with applicable laws and to terminate employees who have caused damage to the Company and/or its subsidiaries;

d.     Exercise good faith to ensure that News Corp. and its subsidiaries were and are operated in a diligent, honest, and prudent manner, and comply with all applicable laws, rules, regulations and requirements;

e.     Fully and honestly cooperate with all legislative, police and other investigations of the activities of the Company, its employees and those retained by them and to avoid obstruction of justice; and

f.      Oversee and conduct the Company's business activities for its sole benefit and in a manner that does not favor any particular shareholder, such as Rupert and/or members of the Murdoch family.

47.     Moreover, News Corp.'s own Standards of Business Conduct, which some or all of the Individual Defendants have blithely ignored, expressly provides:

### Ensuring Integrity and Transparency of Conduct
We refrain at all times from self-dealing, such as steering company business to where we or our family members will benefit improperly.

\*\*\*

### Refraining From Improper Benefit
Keep in mind that you must not only refrain from improperly benefiting from your position or access, you must also guard against family or household members receiving improper advantages. News Corporation employees are responsible for making sure that those close to them do not inappropriately benefit from the employee's position or access.

\*\*\*

### Safeguarding Company Reputation and Property
Avoiding Risk to Reputation: The Company's reputation is one of our most valuable assets. Therefore, we are always careful to be sure that we don't do anything that would harm that reputation, or that would otherwise bring the Company into disrepute.

48.     The Individual Defendants, as detailed herein, breached their fiduciary duties, including the duties of loyalty, good faith, and candor, while also violating the Company's internal standards of conduct.  In addition, as a result of the Individual Defendants' wrongful actions and course of conduct, the Company is now the subject of numerous governmental inquiries and investigations in the United States and abroad, and has expended, and will continue to expend, significant sums of money investigating, defending against and resolving these investigations, as well as related litigation and criminal charges.

49.     In connection with the breaches of duty referred to herein, some or all of the Individual Defendants, together with lawyers retained by them or by News Corp. and/or its

subsidiaries, have used such lawyers (including those within the Company and/or on its Board) to shield their obstruction of justice and illicit conduct from inquiry by creating a pretext of confidential attorney-client privilege/attorney work product to cover (and cover up) their communications and activities.

**B.    Phone Hacking Scandal And Other Illicit Information-Gathering Practices**

50.    In January 2003, Andy Coulson ("Coulson") took over as Editor of the *News of the World* following the move of the Editor, Brooks, to another News International newspaper, *The Sun*. Brooks, reportedly held in high regard by Rupert, had been *News of the World* Editor since May 2000. Later in 2003, both Brooks and Coulson testified before a British Parliamentary committee, during which hearing Brooks admitted to paying police for information, in violation of the FCPA and applicable British law. Brooks stated to Parliament: "We have paid the police for information in the past." Neither the Company's Board nor anyone else at the Company reprimanded her or took any action against her, despite the fact that such practices were violations of the FCPA and may have been illegal under then-British law as well. Additionally, it appears that the Company may have indirectly paid bribes to Paul Stephenson, the now-resigned head of Scotland Yard, through Neil Wallis ("Wallis").

51.    Hinton similarly disavows any knowledge of wrongdoing beyond the activities of Clive Goodman, despite knowing that *News of the World* had numerous documents and e-mails within his and Brooks' control showing as many as 4,000 instances of phone hacking.[9]

---

[9]  Hinton's claim that he was not aware of the existence and extent of the wrongdoing alleged herein is belied by his close supervision of Brooks and daily strategy sessions with her, as well as his hiring of Wallis as Deputy Editor of *News of the World*, notwithstanding his former employer having been previously embarrassed by his journalistic activities and having paid out over $400,000 to settle claims against him. As a result of the recent revelations, it is now known that there were at least 4,000 instances of such hacking and similar activities, many of which activities have been revealed by Scotland Yard to the victims thereof. This, in turn, has resulted in an avalanche of claims being asserted against News International and its senior management, among others. Given the number of such claims, it is likely that

52.     In August, 2006, the Royal Editor at the *News of the World*, and two others, including the Editor of the *Weekly News*, was arrested over allegations of phone hacking made by the British Royal Family in 2005.  Coulson resigned as a result, although insisting that he had no knowledge of any illegal activities.  Coulson went on to become spokesperson for British Prime Minister David Cameron.  In March, 2006, according to several reports, a senior aide to Rupert told a British Parliamentary committee that a "rigorous internal investigation" found no evidence of widespread hacking at the *News of the World*, notwithstanding the fact that apparently he, Brooks, Rupert, James, and other members of the Board apparently were well aware that it had taken place. Coulson was arrested on July 8, 2011 by Scotland Yard.

53.     In 2009 and 2010, further revelations emerged regarding the extent of the phone hacking and the number of *News of the World* employees who may have been aware of the practices.  In July 2009, *The Guardian*, a rival British newspaper, made a series of allegations of more widespread phone hacking activities at *News of the World*, aimed at other individuals and celebrities.[10]  By March 2010, the paper had reportedly spent over £2 million in "hush money" paid to victims of phone hacking and/or members of their families.  According to a July 8, 2011 article in the *Financial Times*, James personally participated in at least some of these settlements, although he claimed not to have knowledge of the full extent of the wrongful activity.  On September 1, 2010, *The New York Times* published the results of an investigation begun almost six months before, which provided additional details regarding the extent of phone hacking at *News of the World* and about Coulson's alleged knowledge of it.  The *Times*' investigation had revealed that a *News of the World* journalist had been attempting to hack into the "answer phone"

---

the Company's present exposure to damages arising from hacking and pinging is at least several hundreds of millions of dollars.

[10] In these instances, the wrongful conduct involved the unauthorized access of voicemail systems, rather than illegal access to actual phone lines or live telephone conversations.

messages of a "television personality" in 2010, resulting in the journalist's suspension and legal action by the personality.  These revelations resulted in hearings by the British Parliament, as well as a renewed investigation by London's police, the Metropolitan Police Service, also known as "Scotland Yard."  Previously, due to the interconnected personal/political/financial relationships between and among the Murdochs, Coulson, Brooks, and representatives of Scotland Yard, including Paul Stephenson, Police Commissioner (who met with News Corp. executives and editors 18 times between November 2005 and November 2010), John Yates, Assistant Police Commissioner (who has social ties to *News International* staff), Andy Hayman (lead investigator in the hacking case and now a columnist for the *Times of London*, a publication owned by News International) and Wallis (media consultant to Scotland Yard, former editor of *News of the World* and News International "mole" within Scotland Yard), substantial amounts of evidence regarding the hacking charges remained unreviewed and, except for a single reporter, Clive Goodman, the investigation was "deep sixed."

54.     The extent of the phone hacking, pinging, and similar illicit information-gathering techniques by News International media, which appear to have been directed at, *inter alia*, former British Prime Minister Gordon Brown and members of his family, staff at Scotland Yard, and many prominent and/or newsworthy individuals, has continued to unfold, almost on a daily basis.[11]  Brooks resigned on July 15, 2011, maintaining falsely that she was unaware of any improper activity during her time at *News of the World* or thereafter.  She has since been arrested by Scotland Yard.  Also on July 15, 2011, Hinton, the top executive at the Company's Dow

---

[11] It has been widely reported that the FBI has begun an investigation of News Corp.'s illicit information-gathering techniques within the United States involving, *inter alia*, alleged pay-offs to members of the New York City Police Department.  Members of the United States Congress, following the lead of the British Parliament, are also seeking to commence legislative investigations of the conduct of the Company, the Individual Defendants, and News Corp. employees, including, in particular, Defendant Carlucci and his colleague, Dominick Porco, President of News America.

Jones subsidiary, who had formerly been Brooks' supervisor, likewise resigned.  At all relevant times, Brooks and Hinton were and are extremely close confidantes of Rupert.

55.     As her arrest indicates, Brooks' claimed lack of knowledge of the hacking and its cover-up is being disputed.  According to a *Reuters* Special Report published on July 16, 2011, entitled, "Inside Rebekah Brooks' *News of the World*," the news room was "an industrialized operation of dubious information-gathering, reporters under intense pressure attempting to land exclusive stories by whatever means necessary, and a culture of fear, cynicism, gallows humor and fierce internal competition."  The *Reuters* Special Report explained:

> Four former employees of [*The Sun*] have told Reuters that Brooks' denials are simply not credible.  They say people on the papers' newsdesk, the hub that directs news coverage, were regularly grilled about the top stories by Brooks and later by her successor Andy Coulson, who resigned over the phone-hacking scandal in 2007 and went on to become Prime Minister David Cameron's spokesman.  "They went in and they were cross-examined for two hours every day.  And it was all about the genesis of all the stories," the first ex-reporter, who worked at the paper for seven years, told *Reuters*.
>
> The *News of the World's* reporting methods were first questioned when it published a story about an injury to Prince William's knee in 2005, prompting fears his aides' voicemail messages were being intercepted.  The royal family complained to police.  More than a year later the paper's royal editor Clive Goodman and private detective Glenn Mulcaire were jailed for six months....

56.     The Company's management, directly and indirectly, improperly used News Corp.'s assets to pay hush money in the form of severance compensation, reimbursement of legal expenses and otherwise to protect the Murdochs and to influence and/or eliminate future testimony.[12]  By way of example, notwithstanding Brooks' complicity in the wrongdoing alleged herein, the Murdochs caused the Company to agree to pay approximately $5.6 million to

---

[12] One of the greatest expenses to the Company is the practice followed by Carlucci and approved by the Board and, in particular, DeVoe, who was instrumental in structuring transactions to buy off victims of News America's predatory, anticompetitive and illegal activities as described below.

Brooks as a severance payment, despite the fact that she voluntarily tendered her resignation and was complicit in at least some of the wrongdoing alleged herein.  Similarly, the Murdochs caused the Company to pay or agree to pay Hinton a far greater amount, despite the fact that he, too, resigned voluntarily from his positions at the Company.  Further, even after reporter Clive Goodman acknowledged his criminal conduct, his legal fees were paid by the Company's management, apparently to buy his silence.  Notwithstanding James' parliamentary testimony and oft-repeated statements to the public that the hacking by Clive Goodman was the work of a "rogue employee," Thomas Crone, the principal in-house lawyer for *News of the World* and Colin Myler, its former Editor, have now publicly admitted that, in 2008, they personally informed James of a 2005 e-mail that suggested, *inter alia*, that hacking of voice mails at the paper went beyond a single reporter and a private investigator.  Indeed, that e-mail, about which James falsely stated he had no knowledge, explicitly detailed numerous instances of hacking and, among other payment, led James to authorize a $1.1 million payment of hush money to one of the paper's victims, Gordon Taylor.  James has since been asked to provide Parliament with a written statement which addresses the inconsistencies between his testimony and statements made by, among others, Messrs. Crone and Myler.[13]  According to *The Wall Street Journal,* James "stands by his testimony."

57.    The agreement to pay Brooks was made despite Rupert's decision to accept Brooks' resignation, even after he had expressed "total" confidence in her only a week earlier.  Indeed, when he arrived in London about 10 days before, Rupert said that protecting her was his chief concern.  According to *The New York Times* of July 18, 2011, when Rupert was asked last week to identify his chief priority in the affair, he pointed to Brooks and said, "This one."

---

[13] Jon Chapman, Director of Legal Affairs at *News International*, has also informed Parliament, according to the *Wall Street Journal,* that "he wants to correct 'serious inaccuracies' he claims were made at the hearing [at which Rupert, James and Brooks testified] earlier this month."

According to one member of Parliament, "The water is now lapping around the ankles of the Murdoch family."

58.     In connection with the hacking scandal, the Murdochs caused the closing of *News of the World*, not to benefit the Company, but, rather, with the hope that it would benefit James and Brooks, protect their careers, and that such a closing would cause the scandal to wane from public, police and Parliamentary interest.  Not only was the Murdochs' panicked strategy to close *News of the World* ill-considered and not carefully analyzed by the Company's Board, if it was analyzed at all, it was unnecessary and a massive waste of News Corp.'s assets.

59.     Notwithstanding its materiality to the Company's business and its reputation in journalism, and the unrelenting public outrage over his and his subordinates' conduct, Rupert testified before Parliament as being out of touch and not knowledgeable with regard to the hacking scandal.  In his testimony, he also would not accept personal responsibility for the "anything goes" culture at News Corp.'s tabloid newspapers.  He blamed what had occurred on "people [he] trusted who let [him] down" and said "it is for them to pay."  There is no reason to believe that Rupert or any of the Individual Defendants will seek repayment to the Company for the damages caused to it as described herein.  Indeed, according to an *Associated Press* report on July 16, 2011, Rupert said the Company had handled the [hacking] crisis "extremely well in every way possible" and complained that he was "getting annoyed" at all the negative headlines.

## C.     Illegal Activities Within the United States

60.     Notwithstanding Rupert's recent assertion that none of the issues that affected *News of the World* had affected other parts of News Corp., in fact, the alleged wrongdoing is widespread, pervasive and reflects a long-tolerated pattern of behavior.  In the United States, another subsidiary of the Company, News America, has paid out many hundreds of millions of

dollars to settle claims that it, under the control of Carlucci, used corporate espionage (including hacking) and breaking and entering into the premises of competitors, among other illicit practices (including below-cost pricing, bribery and other unfair trade practices).

61.     According to a competitor's complaint in federal court in New Jersey, in 2003 and 2004, News America "illegally accessed the computer system [of Floorgraphics,] and obtained proprietary information" and, thereafter, "disseminated false, misleading and malicious information about the plaintiff."[14] According to *The New York Times*, in the midst of trial, News America agreed to pay Floorgraphics $29.5 million for the Company, releases and a non-disparagement agreement. At all relevant times, not only was Carlucci aware of the conduct of *News America*, but such conduct was regularly reported to DeVoe and other members of the Company's senior management. Upon information and belief, such conduct and/or the consequences were provided to the Board and Rupert in particular.

62.     Other anticompetitive behavior by News America management resulted in the payments by it of $500 million to Vallassis Communications and $125 million in 2011 to Insignia Systems, Inc. Carlucci was rewarded for such conduct with his appointment as Publisher of the *New York Post*, in addition to retaining his positions with News America. At no time was he criticized or held accountable by the Board for his and his subordinates' conduct, which he personally encouraged.

63.     Concurrently with the hacking and bribery activities referred to above, senior management of the Company, instead of terminating the employment of Carlucci and those of his subordinates who have damaged News America and the Company, rewarded him with the

---

[14] According to the August 15, 2011 issue of *Time* magazine, "News America admitted to the computer hacking but downplayed it as a minor transgression, probably by a rogue individual. It also blamed the victim, saying Floorgraphics' flimsy website security was asking to be hacked." News America's conduct is illegal under the Computer Fraud and Abuse Act and other statutes.

largely honorific position of Publisher of the *New York Post*, leaving him free to conduct "business as usual" at News America. The Board and senior management looked the other way while Carlucci paid out almost $700 million to competitors to resolve claims of illegal and other improper conduct at *News America* and disregarded the potential that there remain other, even larger claims.

64.     Competitors have also charged that NDS, another News Corp. British subsidiary, similarly conducted business using illegal or otherwise improper practices.  In particular, they charged that NDS employees, with the knowledge of senior management, hacked the competitors' security systems and cracked the codes of rival smart cards used to secure pay-TV set-top boxes, then released the codes to "pirates," who flooded the market with counterfeit cards.

65.     Using similar tactics to those used by News America and News International, NDS "disposed of" litigation brought against it for such anticompetitive practices by Canal Plus Technologies when it paid one billion pounds sterling (approximately $1.7 billion) in exchange for a sister company, Telepiu, an Italian satellite broadcaster.  A similar suit by DIRECTV was "settled" when News Corp took a 34% ownership interest in DIRECTV in 2003.  Another company, EchoStar, is also pursuing litigation against NDS arising out of the same conduct by NDS.

66.     At all relevant times, during the time period when the hacking and other questionable practices were taking place, each of the Defendants in office knew or should have known that these practices were underway.  Klein, upon joining the Board, similarly was informed or should have been informed about the Company's long history of wrongdoing.

67.    As with News Media's blaming the victims for the hacking, it appears that
Coulson, Brooks, Hinton and others, possibly including Rupert, decided that Clive Goodman
would be an appropriate scapegoat to deflect investigations away from his higher-ups, including
each of them. Thereafter, it was falsely contended that the phone hacking at News International
was confined to Clive Goodman and had ended with his departure and subsequent imprisonment.
According to the *Reuters* account:

> Former employees say that's hard to believe, not only because of the story
> approval process, but also because budgets were so tightly controlled that
> payments for such services would not have gone unnoticed. "It's simply
> not conceivable that somebody who was editor wouldn't have known," says
> the journalist who spent seven years at the paper, covering general news.
>
> * * *
>
> When Brooks became editor, at age 31, she had a brief to broaden the
> paper's appeal by intensifying the focus on celebrity and show business
> news and publishing fewer of the harder stories the paper had been known
> for – politicians caught taking illegal drugs or footballers caught with their
> pants down. ...
>
> At the same time, the pressure to get exclusive stories was so intense that
> dubious practices were barely questioned. "They were 'dodgy business
> HQ.' I'm not sure if people even realized it was illegal. It was a don't-get-
> caught culture," said the reporter of seven years' standing. New staff would
> be given the cold shoulder until they'd proved themselves to be "thoroughly
> disreputable" so their colleagues could trust them. "It was no place for
> anyone to pipe up and say: 'This doesn't seem ethical to me.' That would
> have made you a laughing stock."
> Journalists didn't explicitly ask for private investigators to get involved in
> their work, but help would be provided if a reporter got stuck on a
> promising story. "How it arrived on your desk was a bit of a mystery. You
> didn't know and you didn't ask," said the reporter. "Every week,
> somebody's mobile phone records, somebody's landline records, sometimes
> even somebody's medical records. It was common enough not to be
> notable."
>
> A fifth former News International employee who worked with *News of the
> World* journalists at this time said its reporters were under "unbelievable,
> phenomenal pressure," treated harshly by bosses who would shout abuse in
> their faces and keep a running total of their bylines. Journalists were driven

by a terror of failing. If they didn't regularly get stories, they feared, they would be fired. That meant they competed ruthlessly with each other.

Because the *News of the World* was a Sunday paper, where a hot story on Tuesday could be useless five days later, pressure was much more intense than at The Sun, said the ex-journalist who worked at both titles.

"The *News of the World* was much more secretive than the *Sun*. At the *Sun*, you knew what was going on, what people were working on. In the *News of the World* you never knew what anyone was working on. They'd send you out to a job and wouldn't tell you what it was for. It'd be: 'You're going to meet a man. Don't ask his name and whatever you do don't get him excited. Just take his statement and leave,'" he said. "You became a complete survivalist."

Reporters say they lived in constant fear of byline counts which weeded out those who had filed the fewest stories. "They were always seeking to get rid of people because it was a burn-out job. Their ideal situation was you work your nuts off for six months and they let you work there another six months," said the general news reporter. "Every minute you spent there you felt that your employer hated you."

\* \* \*

Contrary to a popular perception that the tabloid threw large sums of money around to get stories, the news budget was extremely tightly controlled, the journalists said. ... This is another reason it was hard to believe senior editors were not aware of phone hacking and other expensive illegal services provided by outsiders, the ex-reporters told *Reuters*. [A] private investigator later jailed for phone hacking, was paid more than 100,000 pounds a year by the *News of the World*. "No newspaper editor would not know what a 102,000 pound budget was used for. They knew about every 50 quid," said the long-term freelancer.

Eavesdropping on voicemail or obtaining call logs was initially a money-saving measure, according to the former employees. Rather than committing a reporter to stake out a venue for as long as it took to catch out a couple having an affair, for example, voicemails could first be scrutinized to establish the time and place of a rendezvous, saving the reporter time and the paper money. As its uses became apparent, it was employed more and more. The general news reporter said he was first shown how to listen in to people's cell phone voicemail by a colleague in the 1990s. "It became the course of first resort rather than last," the long-term freelancer told *Reuters*.

\* \* \*

Editors would then often use damaging stories as bargaining chips, trading them for future access to public figures or to build relationships with stars. Often, the paper would drop the story they had altogether and publish something more sympathetic. "It would be things like: 'We know you were sleeping with your secretary but we'll keep it out of the paper if you give us the story about how you were given away as a child," said the long-term freelancer.

"They used to call stories 'levers'," said the general news reporter. "They weren't necessarily interested any more in using the story you'd proved or got past the lawyers. They were interested in using the story as leverage in order to get a different story. Sometimes the kind of story that you would bargain as an alternative wasn't actually the truth. It annoyed a lot of reporters. "It was relationship-building for them. Basically, she (Brooks) was trading in your hard work to be friends with influential PRs. They used the stories to bank credit with influential people. It then made the whole raison d'etre of the place something different."

68.     Notwithstanding the long history of evidence of the improper and illegal conduct by employees of the Company's subsidiaries in the United States and abroad, its Board ignored the obvious and hoped that previous internal inquiries, which amounted to "whitewashes," would result in such conduct being ignored by the Company's regulators, shareholders, victims, the Justice Department, Scotland Yard, and the British Parliament. This long-practiced conduct finally came to serious public attention in 2010 and has, only recently, spun out of the Murdochs' control.[15]

69.     On or around July 17, 2011, despite Brooks' resignation and subsequent arrest, she reportedly received an estimated $5.6 million (or £3.5 million) as part of a severance package from the Company. Similarly, *News of the World*'s last editor, Colin Myler, is expected to be paid £2.0 million in severance, and two of the Company's senior lawyers, Jon Chapman and Tom Crone, are expected to be paid £1.5 million each in severance. It is believed Hinton's severance package may well exceed all of the foregoing payments. In the cases of Brooks and

---

[15] As with the purported investigations at News International which were tightly controlled by management, a similar "investigation" was carried out at News America, with nothing of substance being done in its wake.

Hinton, any such payments amount to a waste of the Company's assets, since each resigned voluntarily and is not entitled to any severance or similar compensation, which amount to gifts under the circumstances.[16]

**D.    Nepotism**

70.    Over the years, in order to ensure that the Company would remain in the Murdoch family's control, Rupert has improperly caused his sons, James and Lachlan, to be appointed to major operational positions within News Corp. and its subsidiaries, regardless of the appropriateness of such appointments.  Rupert's practice has continued with his daughter, Elisabeth Murdoch ("Elisabeth"), as well.

71.    Indeed, in the *Financial Times* of January 29, 2011, it is stated with respect to Rupert:  "As he approaches his ninth decade, he remains firmly in charge of the family's media business, and of who will succeed him."

72.    As a result of Rupert's domination of the Company and its Board, all of whose members he hand-picked, News Corp. purchased the money-losing record label run by James, Rawkus Records, in order to bring him into the Company.

73.    In order to bring Elisabeth into the management and Board of News Corp. after a 10-year absence, the Murdochs caused the Company to agree to acquire, for $674 million, the Shine Group ("Shine"), a production company founded by her and of which she owned 53% of the equity.  Not coincidentally, Shine retained JPMorgan Chase & Co. ("JPM") to advise Elisabeth and Shine as to the fairness of such a transaction, despite the fact that JPM is already the Company's advisor as to the now-derailed acquisition of the remainder of BSkyB that it does

---

[16] It is also believed that the Company continued to pay Clive Goodman's legal and other expenses, even after his guilty plea, in order to buy his silence and protect senior management.

not already own.  In connection with the acquisition of Shine, Rupert promised Elisabeth a seat on the Company's Board.

74.     But for the fact that Elisabeth is Rupert's daughter, the Company would not have considered making the Shine acquisition, which was at a grossly excessive price.  In connection with the motivation for such a transaction, which is unfair to the Company and a waste of its assets, *The Wall Street Journal* of January 15, 2011 said: "A person briefed on News Corp.'s thinking said senior News Corp. managers have long considered an acquisition of Shine an 'inevitable' way to bring Ms. Murdoch to the company."

75.     Notwithstanding the unfairness of the transaction to the Company, its Audit Committee, consisting of purportedly "independent" Directors, and the entire Board, "rubber stamped" it before it was consummated in April, 2011.  Thus, as a result of such transaction, the Company again has been induced by the Murdochs to expend hundreds of millions of dollars unjustly, thereby wasting News Corp.'s corporate assets.

**E.     The Company Is Being Used Improperly For Rupert's Political Purposes**

76.     Over a period of many years, Rupert has used assets of News Corp. to further his personal political agenda, interests and philosophy.  In 2009 and 2010, he caused the Company to make million-dollar donations to the Republican Governors' Association ("RGA") and U.S. Chamber of Commerce ("Chamber").  At Rupert's behest, News Corp. donated $1 million to the Chamber months before the political group outlined plans to water down anti-bribery laws which could have punished colleagues of the Murdochs in connection with their violations of the FCPA.  A further $1.25 million was donated to the RGA.  News Corp. was the top donor to the RGA in 2010, according to research by the Center for Responsive Politics.

77.     In October, 2010, Rupert acknowledged that the RGA contribution came about as a result of his friendship with former Fox anchor and then-Ohio Republican gubernatorial candidate, John Kasich.  Rupert has been quoted in *Politico* as saying that the $1 million contribution to the RGA "had nothing to do with" News Corp., and was based on his personal friendship with Kasich.  At the 2010 Annual Meeting of shareholders, Rupert admitted that the contribution to the RGA "had nothing to do with Fox News, not News Corp."

78.     Notwithstanding Rupert's acknowledgement of his personal waste of the Company's assets, the Board did nothing to seek to recover these and other funds misspent for Rupert's personal purposes.  Further, in response to requests for greater transparency to shareholders about the Company's political donations, Rupert said: "We've considered from time to time. I don't believe we'll be doing it again. We'll see."

79.     Following shareholder pressure at last year's Annual Meeting and in the wake of the ever-widening phone hacking scandal, News Corp. has adopted a "new policy to publicly disclose corporate political contributions annually on the Company's corporate web site."  The policy states:

> On April 12, 2011, News Corporation's Board of Directors adopted a new policy to publicly disclose corporate political contributions annually on News Corporation's corporate web site (www.newscorp.com).  News Corporation will post on its web site all corporate political contributions made in the 2011 calendar year by January 16, 2012. As part of instituting this policy, News Corporation intends to provide transitional disclosure on its web site of all corporate political contributions made from January 2011 through June 2011 by July 15, 2011.

80.     Although the Board appears to have changed corporate policy in the wake of the hacking and other scandals, to date, it has taken no action to recover from Rupert, or anyone else at the Company, the millions of dollars wrongfully spent by them to further their personal political agendas and philosophies.

**F.**     **The Individual Defendants' False and Misleading Statements**

81.     At all relevant times, the Individual Defendants caused or allowed the Company and its subsidiaries to issue improper statements concerning the scope of the scandals described herein, the Individual Defendants' knowledge thereof, and the gross deficiencies in the Company's internal controls.

82.     The Director Defendants also made statements in the Company's public filings that improperly represented that the Company had in place an effective system of internal controls.

83.     On February 2, 2005, the Company filed its Form 10-Q with the SEC for the quarterly period ended December 31, 2004. The Form 10-Q included the following representations about the Company's disclosure and internal controls, as well as Defendants Rupert and DeVoe's certification thereon:

> ITEM 4. CONTROLS AND PROCEDURES
>
> The Company's Chairman and Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this quarterly report and, based on this evaluation, have concluded that the disclosure controls and procedures are effective.
>
> There have been no changes in the Company's internal control over financial reporting that occurred during the Company's second fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.
>
> *   *   *
>
> I, [K. Rupert Murdoch and David F. DeVoe]. .. , certify that:
>
> 1.     I have reviewed this quarterly report on Form 10-Q of News Corporation;
>
> 2.     Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.      Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial
condition, results of operations and cash flows of the Company as of, and for, the periods presented in this quarterly report;

4.      The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

    (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and preparation of financial statements for the external purposes in accordance with generally accepted accounting principles;

    (c)      Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

    (d)      Disclosed in this quarterly report any change in the Company's internal control over financial reporting that occurred during the Company's third quarter of fiscal 2006 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.      The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's independent registered public accounting firm and the Audit Committee of the Company's Board of Directors:

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

84.      On September 1, 2005, News Corp. filed its Form 10-K for the fiscal year ended June 30, 2005, with the SEC. The Form 10-K contained the following representations and certifications:

> Management of News Corporation is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended. News Corporation's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Internal control over financial reporting includes those policies and procedures that:
>
> •      pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of News Corporation;
>
> •      provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with accounting principles generally accepted in the United States of America;
>
> •      provide reasonable assurance that receipts and expenditures of News Corporation are being made only in accordance with authorization of management and directors of News Corporation; and
>
> •      provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets that could have a material effect on the consolidated financial statements.
>
> Internal control over financial reporting includes the controls themselves, monitoring and internal auditing practices and actions taken to correct deficiencies as identified.

Because of its inherent limitations, internal control over financial reporting, no matter how well designed, may not prevent or detect misstatements. Accordingly, even effective internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation. Also, the effectiveness of internal control over financial reporting was made as of a specific date. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of News Corporation's internal control over financial reporting as of June 30, 2006. Management based this assessment on criteria for effective internal control over financial reporting described in "Internal Control-Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Management's assessment included an evaluation of the design of News Corporation's internal control over financial reporting and testing of the operational effectiveness of its internal control over financial reporting. Management reviewed the results of its assessment with the Audit Committee of News Corporation's Board of Directors.

Based on this assessment, management determined that, as of June 30, 2006, News Corporation maintained effective internal control over financial reporting.

Ernst & Young LLP, the independent registered public accounting firm who audited and reported on the consolidated financial statements of News Corporation included in this report, has issued an attestation report on management's assessment of internal control over financial reporting.

85.     Rupert and DeVoe executed certifications on the foregoing Form 10-K.

86.     The Director Defendants repeated these misrepresentation of material facts regarding New Corp.'s disclosure controls, and the certifications thereon, in the Form 10-Qs and 10-Ks that the Company filed in subsequent years, including the Form 10-Qs filed on November 6, 2008, February 6, 2009, May 7, 2009, November 5, 2009, February 4, 2010, November 4, 2010, February 3, 2011, and May 5, 2011, as well as Form 10-Ks filed on August 13, 2008, August 12, 2009, August 6, 2010, and September 3, 2010.

87.    In stark contrast to the representations made by the Director Defendants and the Company's outside auditor, Ernst & Young, LLP ("E&Y"), attesting to the adequacy of internal controls over financial reporting, the Director Defendants' statements were materially false and misleading because of the widespread deficiencies in internal controls at News Corp.'s subsidiaries that allowed the unlawful conduct complained of herein to occur.

88.    The Exchange Act requires every issuer that has securities registered, pursuant to Section 12 of the Exchange Act, to devise and maintain a system of internal accounting controls sufficient to reasonably assure, among other things, that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

89.    "Internal control" is defined as  "[a] process - effected by an entity's board of directors, management, and other personnel - designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations." AU § 319.06.

90.    "Reportable conditions" are "matters coming to the auditor's attention that in his judgment should be communicated to the audit committee because they represent significant deficiencies in the design or operation of internal control, which could adversely affect the organization because they represent significant deficiencies in the design or operation of internal control, which could adversely affect the organization's ability to initiate, record, process and report financial data consistent with assertions of management in the financial statements."  AU § 325.02.

91.    "[A] reportable condition may be of such magnitude as to be considered a material weakness. A material weakness in internal control is a reportable condition in which the

design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements caused by error or fraud in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing assigned functions." AU § 325.15.

92.     In an effort to protect investors from corporate wrongdoing by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws, Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), 15 U.S.C.§ 7241, entitled, "Corporate responsibility for financial reports," directs that the SEC shall promulgate regulations requiring that, in relevant part, "for each company filing periodic reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934 ... the principal executive officer or officers and the principal financial officers or officers, or person performing similar functions, certify in each annual or quarterly report filed or submitted under either such section of such Act that: (1) the signing officer has reviewed the report; (2) based on the officer's knowledge, the report does not contain any untrue statement of a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading; (3) based on such officer's knowledge, the financial statements and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report; (4) the signing officers (A) are responsible for establishing and maintaining internal controls; (B) have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared; (C) have evaluated the effectiveness of the issuers

internal controls as of a date within 90 days prior to the report; and (D) have presented in the

report their conclusions about the effectiveness of their internal controls based on their

evaluation of that date; (5) the signing officers have disclosed to the issuer's auditors and the

audit committee of the board of directors (or persons fulfilling the equivalent function) (A) all

significant deficiencies in the design or operation of internal controls which could adversely

affect the issuer's ability to record, process summarize, and report financial data and have

identified for the issuer's auditors any material weaknesses in internal controls; and (B) any

fraud, whether or not material, that involves management or other employees who have a

significant role in the issuer's internal controls; and (6) the signing officers have indicated in the

report whether or not there were significant changes in internal controls or in other factors that

could significantly affect internal controls subsequent to the date of their evaluation, including

any corrective actions with regard to significant deficiencies and material weaknesses.

93.     Likewise, Section 906 of Sarbanes-Oxley, 18 U.S.C. § 1350, entitled, "Failure of

corporate officers to certify financial reports," requires, in relevant part:

> a.      Certification of periodic financial reports.  Each periodic report
> containing financial statements filed by an issuer with the Securities Exchange Commission
> pursuant to 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) 78o(d))
> shall be accompanied by a written statement by the chief executive officer and chief financial
> officer (or equivalent thereof) of the issuer.

> b.      Content.  The statement required under subsection (a) shall certify that the
> periodic report containing the financial statements fully complies with the requirements of
> section 13(a) or 15(d) of the Securities Exchange Act of ... 1934 (15 U.S.C. 78m(a) 78o(d)) and
> that information contained in the periodic report fairly presents, in all material respects, the
> financial condition and results of operations of the issuer.

94.     Pursuant to Section 404 of Sarbanes-Oxley, on June 5, 2003, the SEC issued a

final rule and amended Item 307 of Regulations S-K and S-B. *See* Management's Report on

Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act

Periodic Reports, In re Management's Report on Internal Control Over Financial Report and

Certification of Disclosure in Exchange, 2003 WL 21294970, at *11 (SEC Release No. 8238)

(June 5, 2003). Specifically, as part of a company's corporate governance obligations,

management is required to include an internal control report of management that contains the

following in its annual report:

      a.     A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company;

      b.     A statement identifying the framework used by management to conduct the required evaluation of the effectiveness of the company's internal control over financial reporting;

      c.     Management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether or not the company's internal control over financial reporting is effective. The assessment must include disclosure of any 'material weaknesses' in the company's internal control over financial reporting identified by management. Management is not permitted to conclude that the company's internal control over financial reporting is effective if there are one or more material weaknesses in the company's internal control over financial reporting; and

      d.     A statement that the registered public accounting firm that audited the financial statements included in the annual report has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.

      95.     The Public Company Accounting Oversight Board ("PCAOB") adopted the

longstanding auditing provision that a company has a control deficiency "when the design or

operation of a control does not allow management of employees, in the normal course of

performing their assigned functions, to prevent or detect misstatements on a timely basis."

Notice of filing of Proposed Rule on Auditing Standard No. 2, An Audit of Internal Control Over

Financial Reporting Performed in Conjunction With an Audit of Financial Statements, File No.

PCAOB-2004-03 (Apr. 8, 2004). Further, the PCAOB believes that a "deficiency in operation

exists when a properly designed control does not operate as designed, or when the person

performing the control does not possess the necessary authority or qualifications to perform the control effectively." *Id.*

96.     At all relevant times, the Director Defendants, including Rupert and DeVoe, repeatedly opined that internal controls over financial reporting were adequate, despite the fact that the Company's internal controls were routinely circumvented in order to perpetrate the unlawful activities alleged herein.

97.     Despite the weaknesses in internal controls, the Company's financials for the years ended December 31, 2003 through 2011 stated that its internal controls over financial reporting were effective.  Through its agents, Rupert and DeVoe, as CEO and CFO, and the Director Defendants, News Corp. executed "clean certifications" pursuant to Sections 302 and 906 of Sarbanes-Oxley.  But these certifications falsely and misleadingly opined, *inter alia*, that the Company's CFO and CEO disclosed all significant deficiencies and material weaknesses in the design for operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information.

98.     Similarly, the Company's Definitive Proxy Statements, soliciting shareholders' votes, contained false and/or misleading information, as they failed to identify the significant deficiencies and material weaknesses in the Company's internal controls.  At all relevant times Rupert, through the Company's Board, controlled the content of the Company's Definitive Proxy Statements.  As such, each of News Corp.'s Directors, including those named herein as Defendants, were and are responsible for their contents, including the 2012 Proxy Statement

issued and disseminated by the Company for the 2012 Annual Meeting to be held on October 16, 2012.[17]

99.    At the 2012 Annual Meeting, as proposed by the Board, shareholders are being asked to:

- "elect the 14 Directors identified in this proxy statement to the Board of Directors;

- ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2013;

- consider an advisory vote to approve executive compensation;

- consider a stockholder proposal to adopt a policy that the Chairman of the Board of Directors be an independent Director;

- consider a stockholder proposal to adopt simple majority vote;

- consider a stockholder proposal to eliminate the Company's dual class capital structure; and

- consider any other business properly brought before the Annual Meeting and any adjournment or postponement thereof."

100.    With respect to each of the issues being brought to a vote at the 2012 Annual Meeting referred to in the 2012 Proxy Statement, the Director Defendants (indeed, all of the current members of the Board) caused the Company to misrepresent material facts set forth therein or omit other material facts necessary to be disclosed in the context of what was represented.

101.    With respect to the election of Directors of the Company, the 2012 Proxy Statement made numerous statements as to the respective backgrounds of the sitting nominees,

---

[17] In soliciting shareholder votes through the Notice of the 2012 Annual Meeting, the Board stated, *inter alia*, "It is important that your shares of the Company's Class B Common Stock be represented and voted at the Annual Meeting." The 2012 Proxy Statement says: "This proxy statement is furnished in connection with the solicitation by the Board . . . of proxies for use at [the 2012] Annual Meeting."

statements regarding Chao and Uribe and additional statements regarding the Board and its

purported functioning.

102.    As to Uribe's purported qualification for election to the Board, the Proxy

Statement said:

> "Mr. Uribe brings to the Board strong leadership skills gained from his
> distinguished political career and service as President of Colombia. He
> offers the Board a valuable international perspective on political and
> governmental matters."

In making such statements, the Board failed to disclose that Uribe, who is being proffered as an

"independent director," will be asked to deal with the illegal and other highly improper activities

referred to above and is personally embroiled in substantively similar charges in Colombia,

including illegal wiretapping and bribery scandals.  Moreover, in addition to failing to disclose

the serious likelihood that Uribe will be charged criminally in Colombia, the Board omitted any

reference in the 2012 Proxy Statement as to whether, in nominating Uribe, it even considered

such facts in making a determination that he could possibly serve as an "independent director,"

let alone as a director of a publicly-owned company.  Upon information and belief, Rupert

pushed through Uribe's nomination without any serious investigation or discussion of his

previous conduct in Colombia.[18]

103.    As to Chao's purported qualification for election to the Board, the Proxy

Statement said:

> Ms. Chao's work in the public, private and non-profit sectors includes vast
> experience leading large scale, complex and highly visible organizations.
> She offers the Board valuable insights on macroeconomics,
> competitiveness, workforce issues and corporate governance as well as an
> extensive knowledge of the U.S. government at the federal and state levels.

---

[18]  Although the Board claims in the 2012 Proxy Statement that the nominations of Uribe and Chao
originated with the Directors other than Rupert, upon information and belief, their nominations actually
originated with him and/or were pre-cleared by him before they were proposed to the Nominating and
Corporate Governance Committee for consideration.

In making such statements, the Board failed to disclose that Chao, who is being preferred as an "independent director," is, together with her husband, a close personal friend of Rupert and his wife; that Rupert has donated, caused to donate, or influenced the donation of, substantial sums to her husband, McConnell, to his political action committee, and otherwise to support candidates and issues that McConnell and Chao support; that she was, until six weeks ago, a political commentator on Fox News espousing dogma encouraged by Rupert at Fox; and that she is presently a defendant in shareholder litigation relating to her service as a director of a publicly-owned company where charges of breach of fiduciary duty and waste have been made against her.

104.    The 2012 Proxy Statement further stated as to Chao's purported independence:

> "In assessing Ms. Chao's independence, the Board considered her engagement as a contributor on Fox News for which she received fees in an amount below the threshold limit for compensation set forth in the NASDAQ listing rules. In addition, the Board considered contributions made in the past three years by the Company's Political Action Committee (the "News America-FOXPAC") and by certain executive officers and Directors of the Company to the campaign for Senator Mitch McConnell, who is Ms. Chao's husband. The Board noted that no contributions had been made by the News America-FOXPAC since August 2009 when it contributed $5,000 and that, based on available data, contributions by certain executive officers and Directors totaled approximately $5,000 in September 2010 and approximately $5,000 in November and December 2011. The Board concluded that such relationships would not interfere with Ms. Chao's ability to exercise independent judgment as a Director."

105.    In making such statements about Chao's purported qualifications for "independent" status, the Board focused very narrowly on certain contributions made directly to McConnell and failed to disclose substantial additional contributions made as he directed and/or requested to other candidates and political action committees or the fact that Fox News provides

him personally with substantial air time and favorable coverage of his activities and political

positions, all of which are material facts bearing upon Chao's independence.

106.    The Company's 2012 Proxy Statement falsely says, with respect to the Board's

purported corporate governance:

> "The Company is committed to maintaining robust governance practices
> that benefit the long-term rights of stockholders and, along with the Board,
> regularly reviews and updates its corporate governance practices, as
> appropriate, in light of current 'best practices', stockholder feedback,
> changes in applicable laws, regulations and stock exchange requirements
> and the evolving needs of the Company's business."

107.    In fact, the Board has not only specifically ignored current "best practices" of

corporate governance but has, with full knowledge of the wrongdoing by senior officers of the

Company and its subsidiaries, as set forth herein, continued to cover up the full extent of the

wrongdoing, failed to acknowledge the personal responsibility of James, Rupert, Brooks and

Carlucci, among others, and continued to obstruct the many investigations currently underway.

While publicly proclaiming that the Company was cooperating with such investigations, James,

Rupert, Klein and Dinh carefully orchestrated such "cooperation" while, on information and

belief, withheld from production damning documents that implicate James, Rupert, Brooks and

Carlucci in the criminal behavior and the other wrongdoings described herein.

108.    The 2012 Proxy Statement goes on to say that "in September 2011, we adopted a

revised global anti-bribery policy, applicable to all employees" while failing to disclose the

material facts and circumstances that led to the adoption of such policy, including the fact that

such policy did not appropriately address certain of the Company's most significant bribery-

related issues, including the provision of political contributions, non-cash gifts and other

considerations and various "*quid pro quos*" and other favors traded by News Corp. executives

(including the provision of favorable news and editorial coverage to politicians including, *inter*

*alia*, the British Prime Minister and members of his cabinet), all of which practices were well-known to the Company's Board when the anti-bribery policy was adopted.

109.    The Board further states in the 2012 Proxy Statement: "In addition, the updated Statement of Corporate Governance includes the Board's expectation that every employee at every level of the Company act with utmost integrity." Notwithstanding such a false statement, the Company's senior most executives, Rupert and James, repeatedly lied regarding material facts in testimony before a committee of the British Parliament, including personally disavowing knowledge of the criminal activities of their senior management and their subordinates including, *inter alia*, the criminal activities carried out and/or overseen by Brooks.

110.    As to the Company's political activities carried out by, among others, Rupert, James and Brooks, the Board stated in the 2012 Proxy Statement:

> "During the prior fiscal year, the Board adopted the Political Activities Policy which requires advance approval of all Corporate Political Contributions, as defined in the policy, and provides, among other things, that the Company will annually disclose on its website all such Corporate Political Contributions. The Company recently strengthened the Political Activities Policy by requiring that all Corporate Political Contributions must align with the Company's business or community interests, and not those of any individual officer or executive."

111.    In making such statement, the Board failed to disclose the specific political activities of Rupert and Brooks set forth herein, as well as the non-cash favors, inducements and favorable coverage and commentary provided to politicians in the United States, Great Britain and Australia that was in the Murdochs' best interests, but not those of the Company and its other shareholders.

112.    The Board further "affirmatively determined that Sir Roderick Eddington, Ms. Bancroft, Ms. Chao, and Messrs. Aznar, Barnes, Breyer, Dinh and Uribe are independent of the Company and its management." With respect to Dinh, the 2012 Proxy Statement failed to

disclose that Dinh worked in close collaboration with Klein in a failed effort to contain the British bribery and hacking scandals, and to create the appearance of an independent investigation of such illegal activities, all of which was contrary to the Company's best interests. These efforts ultimately backfired after it was revealed that the "investigation" was circumscribed, presumably by Dinh and Klein, in such a way as to deflect attention from the conduct and state of knowledge of senior management, including James, who was and is personally implicated in these activities.

113.    According to the Statement of Corporate Governance adopted by the Board in June 2012 and incorporated by reference in the 2012 Proxy Statement:

> "The Board shall be comprised of a majority of the Directors who qualify as "independent directors" in accordance with the applicable provisions of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the rules promulgated thereunder, and the listing standards of The NASDAQ Stock Market ("NASDAQ"), as they may be amended from time to time. The Board will consider all relevant facts and circumstances in making an independence determination. The Board shall review at least annually and at other times as appropriate and determine the independence of each Director."

114.    In fact, notwithstanding such representations, as evidenced by its nomination of Chao and Uribe as Directors, the Board and its Nominating and Corporate Governance Committee have disregarded material facts about the nominees' lack of independence so long as they have been proposed or otherwise supported by Rupert.

115.    Through the 2012 Proxy Statement, the Board sought shareholder votes for Proposal No. 2, the "ratification of the Audit Committee's selection of Ernst & Young LLP ("E&Y") as the Company's independent registered public accounting firm to audit the books and accounts of the Company for the fiscal year ending June 30, 2013. E&Y has audited the books

and records of the Company since the fiscal year ended June 30, 2002" and in the past two years, was paid approximately $70 million for its services.

116.    In recommending that the Company's shareholders ratify the selection of E&Y as News Corp.'s auditor, the Board failed to disclose that E&Y had failed to competently provide the services for which it was retained including, *inter alia*, identifying internal audit and control weaknesses such as those prevalent, indeed rampant, at the Company as set forth above, which allowed the unlawful conduct complained of herein to occur.  Notwithstanding such repeated audit failures over a multi-year period, the Board members unanimously recommended that shareholders ratify the retention of E&Y as News Corp.'s auditor.

117.    The 2012 Proxy Statement also sought an advisory vote by the Company's shareholders as to executive compensation as disclosed therein.  In particular, the Board proposed the following resolution:

> "RESOLVED, that the Company's stockholders approve, on an advisory
> basis, the compensation of the Company's named executive officers, as
> disclosed in the Company's proxy statement for the 2012 Annual Meeting
> of Stockholders pursuant to the compensation disclosure rules of the SEC,
> including the Compensation Discussion and Analysis, the Fiscal 2012
> Summary Compensation Table and the other related tables and disclosure."

118.    In proposing such resolution to the Company's shareholders, the Board failed to disclose all material facts bearing on the compensation levels of those senior officers implicated in the wrongdoing alleged above, including Rupert, James, Carey and DeVoe, whose bonus and other compensation was disclosed in the Proxy Statement.  Indeed, in discussing their bonus levels, in light of their activities described herein, the 2012 Proxy Statement failed to disclose whether the compensation of the Board considered applying the Company's Bonus Clawback Policies to require such Defendants and others to re-pay News Corp. their excessive bonuses.

119.    The Nathan Cummings Foundation (the "Foundation"), a News Corp.

shareholder, gave notice that it intended to present for action, at the 2012 Annual Meeting, a

resolution to eliminate the Company's dual class capital structure as set forth below:

> "RESOLVED, that stockholders of News Corporation ("News Corp." or the
> "Company") request that the Board of Directors take the necessary steps
> (excluding those steps that must be taken by the Company's stockholders)
> to adopt a recapitalization plan that would eliminate News Corp.'s dual-
> class capital structure and provide that each outstanding share of common
> stock has one vote."

120.    This resolution, clearly motivated in substantial part by the Murdochs' misuse of

their dominance and control of the Company despite only owning a minority of the Company's

total equity, if adopted, would eliminate the voting preference to the Class B shares and elevate

the Class A shares, which have no voting rights.

121.    The Foundation stated in the Proxy Statement in support of its resolution:

> "Dual-class structures like the one in place at News Corp. distort incentives
> and increase agency costs by misaligning economic incentives and voting
> power. High-profile scandals at companies such as Hollinger and Adelphia
> illustrate the dangers of dual-class structures in facilitating the extraction of
> private benefits for management. Governance expert Charles Elson has
> stated that dual-class structures create "a culture with no accountability."
> (Geoff Colvin, "The Trembling at News Corp. Has Only Begun,"
> CNNMoney, July 19, 2011)
>
> Dual-class structures are associated with poorer company performance. A
> 2008 study by Harvard's Paul Gompers and two co-authors found that dual-
> class structures with disparate voting rights were correlated with lower firm
> value. (Paul Gompers et al., "Extreme Governance" (working paper 2008)
> (available at http:// papers.ssrn.com/so13/papers.cim?abstract_id=5625ll))
>
> We believe that the Murdoch family's effective control over News Corp.
> has resulted in decisions that are not in public stockholders' best interests.
> The Company's anemic initial response to the hacking scandal, including a
> cursory internal investigation, suggested a reluctance to hold James
> Murdoch (then head of the News International division) accountable. The
> News Corp. board is not sufficiently independent from the Company and
> the Murdoch family, which impedes robust oversight of management.
> Focusing succession planning on the Murdoch children, which was widely

believed to have been the case until the recent scandal, is not defensible at a
public company, especially one of News Corp.'s size and global reach. (See
Nathaniel Botwinick, "News Corp.'s Line of Succession in Doubt,"
National Review Media Blog, Oct. 19, 2011).

Accordingly, we believe that eliminating the dual-class structure, and
installing a one-share/one-vote arrangement, would benefit News Corp. and
its public stockholders. We urge stockholders to vote FOR this proposal."

122.   The Board expressed its opposition to the Foundation's proposal and stated:

"The Board believes that the current dual class capitalization structure: (a)
promotes stability and continuity in the leadership and management of the
Company, which allows the Company to focus on long-term objectives, (b)
enhances the Company's ability to attract, retain and motivate highly
qualified key employees and (c) provides the Company with greater
flexibility in financing its growth."

123.   The Board went on to provide, in further detail, purported reasons why the
Company's dual class capitalization should be maintained, while also arguing that further action
by the Company's shareholders would be necessary to enact the proposed change.  In proffering
such purported support for the *status quo*, the Board failed to disclose that each of its stated
reasons were equally applicable to a single class capitalization structure and, moreover, that the
principal beneficiaries of such an arrangement are those who maintain their control through dual
class capitalization, such as the Murdochs.

124.   The Company's Definitive Proxies, filed on Form 14A with the SEC on
September 8, 2005, September 7, 2006, September 6, 2007, August 19, 2008, August 20, 2009,
August 31, 2010, September 2, 2011 and September 4, 2012 contained these false and/or
misleading statements made by the Director Defendants.  Each Definitive Proxy Statement
issued and disseminated since 2005 contained a substantially similar false and misleading
"Report of the Audit Committee" section.  The section, in relevant part, states:

"In accordance with its written charter, the Audit Committee assists the
Board in its oversight of (i) integrity of the Company's financial statements

and the Company's financial reporting processes and systems of internal control, (ii) the qualifications, independence and performance of the Company's independent registered public accounting firm and the performance of the Company's corporate auditors and corporate audit function and (iii) the Company's compliance with legal and regulatory requirements, and shall provide an avenue of communication among management, the independent registered public accounting firm, the corporate auditors and the Board of Directors.  Management has the primary responsibility for the preparation of the Company's financial statements and the reporting process, including the system of internal control over financial reporting.  The independent registered public accounting firm has the responsibility for the audit of those financial statements and internal control over financial reporting.

In discharging its oversight responsibility as to the audit process, the Audit Committee (i) obtained from the independent registered public accounting firm a formal written statement describing all relationships between the independent registered public accounting firm and the Company that might bear on the independent registered public accounting firm's independence consistent with Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees," (ii) discussed with the independent registered public accounting firm any relationships that may impact its objectivity and independence, and (iii) considered whether the non-audit services provided to the Company by Ernst & Young LLP are compatible with maintaining the accountants' independence.  The Audit Committee reviewed with both the independent registered public accounting firm and the corporate auditors their identification of audit risks, audit plans and audit scope.  The Audit Committee discussed with management, the independent registered public accounting firm and the corporate auditors the corporate audit function's organization, responsibilities, budget and staffing.

The Audit Committee also discussed and reviewed with the independent registered public accounting firm all communications required by generally accepted accounting standards, including those described in Statement on Auditing Standards No. 61, as amended, "Communication with Audit Committees."  The Audit Committee met with each of the independent registered public accounting firm and the corporate auditors, both with management present and in private sessions without management present, to discuss and review the results of the independent registered public accounting firm's audit of the financial statements, including the independent registered public accounting firm's evaluation of the accounting principles, practices and judgments applied by management, the results of the corporate audit activities and the quality and adequacy of the Company's internal controls.

The Audit Committee discussed the interim financial information contained in each of the quarterly earnings announcements with Company management and the independent registered public accounting firm.  The Audit Committee also reviewed the audited financial statements of the Company as of and for the fiscal year ended June 30, 2005 with management and the independent registered public accounting firm.

At three of its meetings during fiscal year 2005 and one meeting during fiscal year 2006, the Audit Committee met with members of management, the independent registered public accounting firm and corporate auditors to review the fiscal 2005 quarterly certifications provided by the Chief Executive Officer and the Chief Financial Officer under the Sarbanes-Oxley Act, the respective rules and regulations of the SEC and the overall certification process.  At these meetings, management reviewed with the Committee each of the Sarbanes-Oxley Act certification requirements including whether there were any (i) significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and (ii) any fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal control over financial reporting.

Based on the above-mentioned review and discussions with management, the independent registered public accounting firm and the corporate auditors, the Audit Committee recommended to the Board that the Company's audited financial statements be included in its Annual Report on Form 10-K for the fiscal year ended June 30, 2005, for filing with the SEC. The Audit Committee also recommended the reappointment, subject to stockholder ratification, of E&Y as the Company's independent registered public accounting firm, and the Board concurred in such recommendation."

125.    In each of the Company's foregoing Definitive Proxies, the Reports of the Audit

Committee failed to reveal material weaknesses in News Corp.'s internal controls.  The Director

Defendants knew or reasonably should have known of these misstatements and omissions and

failed to prevent or correct them.

### G.   Damages To The Company

126.   To date, the Company has sustained massive financial and reputational damages due to the conduct of News International and News America Officers as described above, in amounts which cannot presently be calculated and which damages will continue to grow.

127.   In the wake of the unfolding scandal, in addition to increasing active Scotland Yard and Parliamentary investigations, the FBI has commenced an investigation of the Company's possible criminal activities, including possible cybercrimes, public corruption and white-collar crime, and the SEC is believed to be investigating Brooks' admission that the Company paid bribes for information.  It is not unlikely that the United States Congress will commence investigations of the Company, the conduct of its management and its power in the media industry.

128.   According to *The New York Times* of July 18, 2011, "The damage is likely to continue to mount, perhaps because the underlying pathology is hardly restricted to those who have taken the fall." This is particularly so as the approximately 4,000 known victims of *News of the World*'s hacking learn that they have been targeted.  Similarly, other victims of the same or similar practices by other publications and subsidiaries continue to come to light.  In 2009 alone, the Company paid out $1.6 million to settle claims related to the *News of the World* hacking scandal, as well as hundreds of thousands of dollars in legal expenses related thereto and, in the United States, it paid out, through News America, almost $700 million to obtain releases for conducting illegal and/or otherwise improper conduct. When added to the massive sums the Company has paid out to acquire companies as a means of terminating litigation against it, the potential damages exceed $2 billion.

129.    What may result in even greater damage to the Company and its shareholders is the fact that, as a consequence of the hacking scandal, revelations of widespread wrongdoing and the subsequent disclosures, there has been renewed interest in breaking up News Corp. through legislative means.  Similarly, leading members of Parliament have asked the British government to investigate whether News Corp. is a "fit and proper" owner of its stake in BSkyB, of which James is Chief Executive, possibly causing it to divest its share holdings therein.

130.    In addition to the above damages and potential damages, Standard & Poor's has warned that it might lower the Company's credit ratings because "recent events have materially increased its reputational, management and litigation risks."  Indeed, any such lowering would materially increase the Company's cost of borrowing.

## DERIVATIVE ALLEGATIONS

131.    Rupert and the Murdoch Family Trust, which Rupert controls, own beneficially approximately 39.7% of the Company's Class B common stock outstanding, which gives them voting control of News Corp.  These Class B shares are the only common stock which has voting power; the Class A shares having none.

132.    Although the Murdochs own only about 12% of the total equity of the Company, by reason of their ownership of voting control, they treat News Corp. as their personal fiefdom.  The Company is routinely referred to as Rupert's and has become, in practical effect, an appendage to him.  *The New York Times* has said on July 19, 2011 with respect to Rupert:  "…[H]e controls [the Company] lock, stock and barrel."

133.    Through his family's Class B stock holdings, Rupert nominates all members of the Company's Board, who serve at his pleasure.  Thus, he has absolute control over the Company and its Board.  Although some Directors are denominated as "independent," that is not

the case with respect to the conduct described herein. Each and every member of the Board is implicated in such wrongdoing and/or its cover-up and not a single one of them is disinterested or free of conflict of interest.

134.   As reported by the *Financial Times* on July 19, 2011, in quoting a person close to the Board, the Directors were "perfectly aligned" behind Rupert and "There is no daylight between management members of the Board and independent members." Despite being described by the Company, as supposedly "independent," its Directors were mocked as being anything but, by CNN Legal Analyst Jeffrey Toobin on the air on July 19, 2010, and about whom *The New York Times* said on the same day: "The board of the News Corporation might as well be named "Friends of Rupert."" *The New York Times* went on to say: "Despite multiple arrests stemming from the phone hacking accusations so far, not one independent board member has made a statement denouncing the company's dubious activities. Not one has publicly called for the resignation of top officials at the company. And not one has pushed for an outside investigation…" Nell Minow, a proponent of good corporate governance, is quoted as saying with respect to the Company's Board: "It is the ultimate crony board."

135.   Despite years of misconduct which was known and should have been known to each member of the Board, its members have been somnolent, suffering "collective amnesia" and an unwillingness to rock the Murdoch boat, which would put at risk their very substantial perquisites and emoluments of holding directorships with substantial compensation, opportunities to network with the rich and famous, and otherwise. Indeed, despite the reservations of some Board members, all acquiesced in Rupert's desire to acquire MySpace, a social network, without ample investigation and for an excessive price, $580 million. The folly

of this ego-driven purchase generated hundreds of millions of dollars of losses for the Company, which ultimately sold MySpace earlier this year for $30 million.

136.    As such, no pre-suit demand to commence litigation against Defendants and pursue the claims set forth herein is legally necessary or appropriate, since any such demand would be futile.  Absent a replacement of the entire Board and elimination of the Murdochs' voting advantage, the Directors of the Company will continue to ensure that no remedial action takes place, including any action to recover the Company's massive damages from the wrongdoers.

137.    In addition, the Individual Defendants authorized and/or permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and, thus, they could not fairly and fully prosecute such a suit even if they instituted it.

138.    Plaintiff brings this action derivatively to redress injuries suffered by the Company and caused by the breaches of fiduciary duties, waste of corporate assets, and mismanagement of the Individual Defendants, as well as for the dissemination of false and/misleading material information concerning the inadequacy of the Company's internal controls.

139.    Plaintiff will adequately and fairly represent the interests of News Corp. and its shareholders in enforcing and prosecuting the Company's rights, and she has retained counsel who is competent and well-experienced in shareholder derivative litigation.

## FIRST CAUSE OF ACTION

### Violation Of Section 14(a) Of The Exchange Act

140.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

141.   This claim is brought under Section 14 of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9.

142.   Section 14 of the Exchange Act prohibits the solicitation of any proxy in contravention to the rules promulgated thereunder.

143.   Rule 14a-9 provides that no proxy solicitation shall be made by means of any proxy statement or other communication containing "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false and misleading."

144.   The Director Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders contained in the Company's Definitive Proxies issued and disseminated during the years 2005-2012, which misrepresented or failed to disclose, *inter alia*, the material facts set forth above, in violation of Section 14(a) of the Exchange Act.

145.   This information would have been material to the Company's shareholders in determining whether to elect or re-elect the Director Defendants to manage their Company, to ratify the Audit Committee's retention of E&Y as the Company's auditor and to vote in favor of the Foundation's proposal as set forth in the 2012 Proxy Statement made in connection with the elimination of the Company's dual class capitalization structure and otherwise.

146.    The Company, Plaintiff and all other shareholders of the Company (other than the Murdochs and their confederates) have been damaged as a result of the material misrepresentations contained in and/or omitted from the foregoing Proxy Statements.

147.    Plaintiff, on behalf of the Company, thereby seeks to void the election of the Director Defendants and negate the actions to be taken at or in connection with the 2012 Annual Meeting based upon the aforementioned misleading and incomplete Proxy Statements for the years 2005-2012.  The Court should require the Board to issue and disseminate a corrected 2012 Proxy Statement in compliance with all disclosure requirements of applicable federal and other law.

## SECOND CAUSE OF ACTION

### Breach Of Fiduciary Duty Of Loyalty

148.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

149.    Each of the Individual Defendants owed to News Corp. and its shareholders a fiduciary duty of loyalty in their management and oversight of the affairs of the Company.

150.    By the conduct alleged above, the Individual Defendants breached their fiduciary duties of loyalty to News Corp. and its shareholders by approving, acquiescing and/or ignoring the longstanding illegal and otherwise questionable information-gathering practices conducted at *News of the World*, and other newspapers published by News International at NDS and News America, and acting as otherwise alleged herein in furtherance of Rupert's personal interests and those of his family members.

151.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, News Corp. and its shareholders have suffered enormous damages, including, but not limited to:

     a.     diminution of the Company's value and price of its common stock;

     b.     ongoing, distracting investigations and proceedings, including increased governmental, police, regulatory and legislative scrutiny of the operations of the Company and its subsidiaries which the Board is incapable of dealing with objectively, fairly and in the Company's best interests;

     c.     the inability to finalize the acquisition of BSkyB, which would have become accretive to the Company's revenues and earnings; and

     d.     irreparable damage to the Company, its reputation, and its business prospects.

152.    Plaintiff hereby demands that the Individual Defendants repay the Company its damages.

## THIRD CAUSE OF ACTION

**Breach Of Fiduciary Duties For Failing To Properly Oversee And Manage The Company**

153.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

154.    By reason of their fiduciary relationships with News Corp., the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

155.    By reason of the wrongdoing alleged herein, the Individual Defendants, and each of them, violated and breached their fiduciary duties of good faith, fair dealing, loyalty, and due care, as well as of reasonable inquiry, oversight, and supervision.

156.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, News Corp. has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

157.    As a result of the misconduct alleged herein, the Individual Defendants and each of them are liable to the Company.

158.   Plaintiff hereby demands that the Individual Defendants repay the Company its damages.

## FOURTH CAUSE OF ACTION

### Waste Of Corporate Assets

159.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

160.   As a result of the misconduct alleged herein, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused News Corp. to incur (and the Company will continue to incur) significant legal liability and/or expenses to defend itself, as well as to answer to numerous governmental investigations and inquiries, as a result of Defendants' unlawful and/or otherwise inappropriate actions.

161.   As a result of the unjustified purchase of Shine by the Company for excessive consideration which, *inter alia,* enriched Elisabeth, and the continued employment and providing directorships to Rupert's children, the Company's assets have been wasted and it has been badly damaged.

162.   As a result of the political contributions made by the Company for the personal benefit of Rupert and others designated by him, as well as the improper severance payments to Brooks and Hinton, the Company's assets have been further wasted, as set forth above.

163.   In light of the fact that certain of the wrongdoings alleged herein have occurred over a period of many years, it is possible that applicable statutes of limitations may have been allowed to run without the Company seeking recovery of its damages from the wrongdoers.  To the extent that the Board and/or senior management of News Corp. has failed to protect the Company's interests by obtaining appropriate agreements from the wrongdoers tolling the running of applicable statutes of limitations and/or letting such statutes of limitations run without

commencing litigation against the wrongdoers, the Board and senior management have wasted the Company's assets.  The Board has adopted what the Company describes as Bonus Clawback Policies. These are:

> "policies requiring the recoupment of performance-based bonus compensation paid to the named executive officers in the event of certain financial restatements or of other bonus compensation paid to executives in certain other instances. The policies require reimbursement to the extent permitted by governing law and any employment arrangements entered into prior to the adoption of the policies."

164.    Notwithstanding such Bonus Clawback Policies and the continued wrongdoing of senior management of the Company, including Rupert, James and Carlucci, as well as Brooks, the policies have been, *de facto*, ignored by the Board, which has never sought to recover the unjustified performance-based bonuses. Thus, the Board has wasted News Corp.'s assets by not enforcing these policies, particularly against Rupert, James and Carlucci, as well as against Brooks.  Such waste has also been exacerbated by the Board providing them with wholly unjustified compensation packages and, in the case of Brooks, paying her "hush money" to protect against her implication of Rupert and James.

165.    As a result of such waste of corporate assets, the Individual Defendants are liable to the Company.

166.    Plaintiff hereby demands that the Individual Defendants repay the Company for its wasted assets.

### FIFTH CAUSE OF ACTION

#### Gross Mismanagement

167.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

168.    The Individual Defendants had and have a duty to News Corp. and its shareholders to prudently supervise, manage, and control the operations of the Company.

169.    The Individual Defendants, by their actions and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of News Corp. in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence and candor in the management and administration of News Corp.'s affairs and in the use and preservation of the Company's assets.

170.    During the course of the discharge of their duties, the Individual Defendants knew, or recklessly disregarded, the unreasonable risks associated with the misconduct alleged herein, yet they caused, acquiesced, or ignored that the Company was engaged in such wrongdoing, which they knew had an unreasonable risk of damage and/or unjustified expense to News Corp., thus breaching their duties to the Company.

171.    As a result thereof, the Company has been damaged.

172.    Plaintiff hereby demands that the Individual Defendants repay the Company its damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

a.      Voiding the election of the Director Defendants, which was the result of a materially misleading proxy, in violation of federal securities laws and requiring the distribution of corrected disclosures and a new vote;

b.      Declaring that the Individual Defendants have breached their fiduciary duties to News Corp., wasted its assets, and engaged in gross and blatant mismanagement of the Company;

c.      Awarding News Corp. full compensatory damages against the Individual Defendants, jointly and severally, in an amount to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

d.      Requiring the Individual Defendants to remit to the Company all of their salaries and other compensation received for the periods during which they breached their duties;

e.      Ordering that the Individual Defendants, and those under their supervision and control, refrain from any further such unlawful activities as are alleged herein, and to immediately implement corrective measures, including a system of internal controls and procedures sufficient to prevent the repetition of the acts complained of, which will rectify all such wrongs as have been committed and to prevent their recurrence;

f.      Requiring that the Individual Defendants establish new corporate governance procedures which would have the effect of decreasing the likelihood that the type of conduct described in this Complaint would reoccur;

g.      Awarding full voting rights to the Company's Class A shares;

h.      Pending the next meeting of News Corp.'s shareholders at which all shareholders have equal voting rights, appointing a Conservator to oversee the Company's responses to the various investigations and lawsuits described herein, the Board having shown that it is badly conflicted and prone to acting to benefit the Murdochs, at the expense of the Company;

i.      Awarding Plaintiff reasonable attorneys' fees and costs and all other recoverable expenses of litigation; and

j.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all issues so triable.


Dated:  October 4, 2012

By: _____

Richard D. Greenfield (RG-4046)
Ilene F. Brookler
Greenfield & Goodman, LLC
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone: (917) 495-4446
Facsimile: (212) 355-9592
Email: whitehatrdg@earthlink.net

Scott R. Shepherd
Shepherd, Finkelman, Miller & Shah, LLP
35 E. State Street
Media, PA 19063
Telephone:  (610) 891-9880
Facsimile:  (610) 891-9883
Email: sshepherd@sfmslaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**G. E. STRICKLIN,**
derivatively on behalf of NEWS CORPORATION,

Plaintiff,

v.                                                      Civil Action
                                                        No. 11 civ 05073(PGG)

**K. RUPERT MURDOCH; et al**

Defendants.

# <u>VERIFICATION</u>

I, G. E. Stricklin, hereby declare and verify as follows:

I am the plaintiff in the above-captioned case. I have read the contents of the

foregoing Second Amended Complaint. I am informed and believe that the

facts related therein are true, based upon facts as related to me by my

counsel, and on that ground, I verify that the facts stated therein are true.


*G.E. Stricklin*
G. E. Stricklin

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

G.E. STRICKLIN, derivatively on behalf of        :
NEWS CORPORATION,                                :
                                                 :
                 Plaintiff,                      :
                                                 :        Civil Action No. 11-cv-05073 PGG
        v.                                       :        **ECF Case**
                                                 :
K. RUPERT MURDOCH; *et al.*,                     :        **CERTIFICATE OF SERVICE**
                                                 :
                 Defendants,                     :
                                                 :
        and                                      :
                                                 :
NEWS CORPORATION,                                :
                                                 :
                 Nominal Defendant.              :
_____              :

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2012, I filed the Second Amended Complaint, with the

Clerk of Court and sent by first class mail, postage pre-paid a copy of the same to all counsel of

record on the attached list.

Richard D. Greenfield (RG-4046)

-1-

## SERVICE LIST

**Jay B. Kasner**
Skadden, Arps, Slate, Meagher & Flom LLP (NYC)
Four Times Square
42nd Floor
New York, NY 10036
212 735 3000
Fax: (212) 735 2000
Email: jkasner@skadden.com

**Scott D. Musoff**
Skadden, Arps, Slate, Meagher & Flom LLP (NYC)
Four Times Square
42nd floor
New York, NY 10036
(212) 735-3000
Fax: (212) 735-2000
Email: smusoff@skadden.com

**Brian Jason Fischer**
Jenner & Block LLP (NYC)
919 Third Avenue, 37th Floor
New York, NY 10022
(212) 891-1629
Fax: (212) 891-1699
Email: bfischer@jenner.com

**Eugenic C. Gavenchak**
Jenner & Block LLP
1211 Avenue of the Americas, 13th Floor
New York, NY 10036
(212) 852-7024
Fax: (212) 852-7214

**Julie A. Shepard**
Jenner & Block LLP
633 West 5th Street
Suite 3600
Los Angeles, CA 90071
(213) 239-2207
Fax: (213) 239-2217
Email: jshepard@jenner.com

**Kenneth David Klein**
Hogan Lovells US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
(310) 785-4725
Fax: (310) 785-4601
Email: kklein@jenner.com

**Marisa K. Perry**
Jenner & Block LLP
919 Third Avenue
New York, NY 10022
(212) 891-1623
Fax: (212) 909-0823
Email: mperry@jenner.com

**Richard L. Stone**
Jenner & Block LLP (LA)
633 West 5th Street, Suite 3500
Los Angeles, CA 90071
(213) 239-2203
Fax: (213) 239-2213
Email: rstone@jenner.com